BULLARD, (BYAM v.). See Case No. 2,262.

## Case No. 2,122.

### BULLARD et al. v. ROGER WILLIAMS INS. CO.

[1 Curt. 148.] [1]

Circuit Court, D. Rhode Island. June Term, 1852.

MARINE INSURANCE — ACTION ON POLICY — ABANDONMENT — TOTAL LOSS — EVIDENCE — PRESUMPTION — BURDEN OF PROOF — "SEAWORTHINESS."

1. There is no presumption that defects, found to exist in the hull of a vessel during the voyage, were produced by a peril of the sea. The burden is on the assured to prove this.

[Cited in Lunt v. Boston Marine Ins. Co., 6 Fed. 568.]

[See Watson v. Insurance Co., Case No. 17,285; Donnell v. Columbia Ins. Co., Id. 3,987; Tidmarsh v. Washington Ins. Co., Id. 14,024; Hicks v. Fitzsimmons, Id. 6,460; U. S. v. Mitchell, Id. 15,792; Pyman v. Von Singen, 3 Fed. 802.]

2. A letter of abandonment must state the cause of the loss, and when stated, it must appear to have been a peril insured against.

[See Columbian Ins. Co. v. Catlett, 12 Wheat. (25 U. S.) 383.]

3. If a vessel be so injured by a sea peril as not to be repairable, except at an expense exceeding its value when repaired, the loss is actually total, and no abandonment is necessary.

[See Patapsco Ins. Co. v. Southgate, 5 Pet. (30 U. S.) 604; Bradlie v. Maryland Ins. Co., 12 Pet. (37 U. S.) 378; also, Hugg v. Augusta Ins. Co., Case No. 6,838.]

4. The valuation in the policy fixes the value of the vessel for this purpose under the form of policy used in Boston and some other places.

5. Seaworthiness of the hull is such a state of the hull, as is competent to resist the ordinary action of winds and waves in the voyage for which the vessel is insured.

[Cited in The Orient, 16 Fed. 916.]

6. Heavy cross seas are not the ordinary action of the sea, within the meaning of this rule, however common they may be in the voyage insured.

This was an action [by Silas Bullard and others] on a policy of marine insurance on the brig Star, at and from Fall River to Havana, and thence to a northern port in the United States. The vessel was valued in the policy at $3,000, and was insured for $2,000. It appeared that the vessel performed her outward voyage to Havana, took a cargo of molasses there, and sailed on her return voyage. Soon after leaving the harbor of Havana, she met the cross sea, which is ordinarily thrown up in the Florida gulf, by the meeting of the trade wind and the gulf stream. She soon sprung a leak, which increased, and it became necessary to put away to Key West. The brig was there hove out and surveyed, and the report of the surveyors, which was supported by their depositions, taken under a commission and read at the trial, showed that the expense of repairing her would be $2,000, and that when repaired the brig would not be worth the cost of her repairs; and the surveyors having recommended a sale, she was sold by the master. The plaintiffs claimed to recover as for a total loss. The points ruled, and the instructions given to the jury, appear in the charge of the court. [The jury rendered a verdict in favor of plaintiffs for a partial loss.]

Mr. Blake, for plaintiffs.

Ames & Jenckes (with whom was Carpenter), for defendants.

CURTIS, Circuit Justice. The plaintiffs claim to recover from the defendants a sum

---

[1] [Reported by Hon. B. R. Curtis, Circuit Justice.]

of money alleged to be due under a policy of insurance. They show that at Key West this vessel needed certain repairs. It is incumbent on them to prove that these repairs were rendered necessary by some peril insured against in the policy. Even if you are satisfied, this vessel was seaworthy at the beginning of her voyage, there is no presumption that the necessity for these repairs was occasioned by a peril insured against. The burden is still on the insured to prove that by some peril within the policy, the vessel received injuries requiring the expenditures shown by the surveyors' testimony. The perils insured against in this policy, so far as the present case is concerned, are "perils of the sea," and the inquiry is, whether the damage suffered by this vessel was from a peril of the sea. Damage done to a vessel by perils of the sea, includes every species of damage done to the vessel at sea, by the violent and immediate action of the winds, or waves, or both, as distinct from the ordinary wear and tear of the voyage, and as distinct from injuries suffered by the vessel, in consequence of her not being seaworthy at the outset of her voyage, or afterwards, under circumstances in which the master was guilty of negligence in not making her seaworthy.

In this case there is no pretence of any negligence by the master during the voyage, though there is a serious question, for your consideration, whether the vessel was seaworthy at the outset of the voyage. The law in reference to this will be presently stated; but in considering whether this damage was done by a peril of the sea, or was merely a consequence of the action of the sea on a weak, decayed, and unseaworthy vessel, I think you have a right to presume, at the outset, the vessel was seaworthy at the beginning of the voyage, because, as will be presently stated to you, the law so presumes until the contrary appears. You have evidence of the state of the wind and sea from the time the brig left Havana till she arrived in Key West. You also have evidence what injuries the vessel sustained, and you will say whether these injuries were done to this vessel by the violent and immediate action of the winds and waves, or whether, though suffered by reason of their action, they were attributable to the weak and decayed state of the vessel at the commencement of the voyage.

It has been stated, by the defendants' counsel, that the law requires all vessels to be so strong as to resist the ordinary action of the sea, in the voyages for which they are insured. This is true. It is also said, and you will judge whether it is satisfactorily shown, that a cross sea is ordinarily to be expected to be met with, in the Florida gulf stream, and that if this vessel broke down in such a sea, this is conclusive proof that she was not seaworthy for this particular voyage. But I do not understand that the law requires vessels to be so strong as not to receive injury from any state of the winds and sea which may ordinarily be expected in the voyage for which she is insured. This is not what is meant by the ordinary action of the winds and sea. In some sense gales and heavy seas may be said to be ordinary. They are of very frequent occurrence in some parts of the world. A vessel going round Cape Horn, in the winter, scarcely fails to encounter them. But if damage is suffered by their action on the vessel, or cargo, it would certainly be no defence for the underwriter to say, that in that voyage they almost always occur, and the vessel should have been strong enough to resist them. Gales of wind and heavy cross seas are not the ordinary action of the sea, in the sense of the law of insurance, and when injury is suffered by a seaworthy vessel from their action on her, she is damaged by a peril within the policy. At the same time, if seaworthy vessels usually, and, so far as appears, always, go through such seas as are described by these witnesses to have existed on this passage, without sustaining material injury, it certainly tends to show that the injuries suffered by this vessel are to be ascribed, not to a peril of the sea, but to the insufficiency of this vessel. It is a matter of fact for your good sense to determine. The law raises no presumption concerning it, and, I apprehend, cannot safely do so. Because, when the winds and seas are not in their ordinary state, it is impossible to say, beforehand, what effects they will produce upon seaworthy vessels. One may get an unlucky twist, as seamen call it, and be broken down, while another, under circumstances apparently no more favorable, receives no injury. And therefore there is no legal presumption to guide you; but you must consider and weigh the probabilities of the case, and say whether the plaintiffs have satisfied you, considering the state of the wind and sea, the kind and degree of damage suffered by the brig, the general condition in which she was found by the surveyors, and the uniformity with which great numbers of vessels encounter such seas without receiving injury, that these were damages done by perils of the sea. If you find damage was done to the vessel by perils of the sea, which it would cost $300 to repair at Key West, then you must proceed further. The policy does not insure against partial losses of less amount than ten per cent., and therefore you cannot find for the plaintiffs less than $300; but if you find that more than that sum was necessary to repair damage done to the vessel by a peril of the sea, you will then inquire whether the plaintiffs are to recover for a total or a partial loss.

The vessel was not, in point of fact, totally lost. She remained in specie, and was capable of being repaired. But still the plaintiffs may be entitled to recover as for a total loss. In order to do so, however, they must

show that they have seasonably tendered to the underwriters a sufficient abandonment, or that this was a case in which no abandonment was necessary. Their letter of abandonment has been produced. It states that the vessel has been condemned at Key West, and refers to a letter from the master to the owners, which was sent therewith. The contents of this last letter are, I think, incorporated into the letter of abandonment by the reference to it which the latter contains; but still there is no statement whatever of the cause of the damage. Nothing is said, in either letter, respecting any peril of the sea. Now, a letter of abandonment must state the cause of the loss, and the cause stated must be a peril within the policy. I instruct you, therefore, that there was not any sufficient abandonment. Was this a case in which no abandonment was necessary? An abandonment is necessary only in case of a constructive total loss; if the loss be actually total the insured may recover for it, without an abandonment. It has been much discussed what constitutes a total loss when the vessel remains in specie and still retains the form of a vessel, in a place of safety. I shall not trouble you with the different views which have been taken of this question, but I will state the rules which I deem proper for your guidance. It is manifest that the form of a vessel may remain and be in a place of safety, and yet, for all useful purposes, the vessel may have ceased to exist. If she be absolutely incapable of repair, so as to be fitted to encounter the seas, then she has ceased to exist as a vessel, though great part of her materials may remain, and they may still be in the form of a vessel. So, though capable of being repaired and restored to the condition of a sea-going vessel, yet if this can only be done at an expense exceeding the value of the vessel when repaired, it is an expense which no one is bound to incur, and therefore the case is the same as if absolutely irreparable; there being no practical difference, for this purpose, between what cannot be done at all, and what no prudent person would undertake to do. And, therefore, if you should find, from the evidence in the case, that the injuries suffered by this brig from perils of the sea were so great, that they could not be repaired so as to make her a seaworthy vessel, except at an expense exceeding her value when repaired, then this was a case of actual total loss, and no abandonment was necessary.

And here you will perceive it is necessary to have some standard to which to refer in fixing the value of the vessel, when repaired. The parties have agreed in the policy on the value of the vessel: they have fixed it at $3,000; is this sum to be taken as her value when repaired, or are you to inquire into what would have been her actual value at Key West, in case she had been repaired? This is a question of no small difficulty, ow-

ing to the particular terms of this policy. The general rule, as settled by the supreme court of the United States, would require you to ascertain what the value of the brig would have been if repaired, and the agreed valuation, so far from being conclusive, would not usually afford any considerable aid in arriving at this result. But I find great difficulty in holding that rule applicable to this policy, which contains a clause, "that the insured shall not have the right to abandon the vessel for the amount of damage merely, unless the amount which the insurers would be liable to pay, under an adjustment as of a partial loss, shall exceed half the amount insured;" and further, "in the adjustment of claims for repairs in the vessel, whether in the nature of a partial loss, or general average, there shall first be a deduction of one third, new for old, from the cost of labor and materials required in making the repairs." Now, suppose you take the estimate of the surveyors at Key West to be correct, that it would cost $2,000 for labor and materials to repair the brig, and then ascertain what these insurers would be liable to pay, under an adjustment as of a partial loss; and it would stand as follows:

Cost of labor and materials........ $2,000 00
⅓ new for old.................... 666 66
                                   ————
    Partial loss ................. $1,333 34
Defendants insured............... $2,000
⅔ of the valuation, and pay ⅔ partial loss=...................... $ 888 88

—Which is less than half the amount insured; so that there was no right to abandon for a constructive total loss. And yet, if the opinion of the surveyors is to be adopted, the vessel, when repaired, would not have been worth $2,000, and therefore if you were to disregard the valuation in the policy, and take the opinion of the surveyors to be well founded, there would be an actual total loss, for which the insured might recover without any abandonment, though, according to his own contract in the policy, it was not even a case of constructive total loss, upon which he could recover with the aid of an abandonment. This consequence seems to me to be so inconsistent with what the parties must have intended, that I should be forced to it with great reluctance; and therefore I have concluded to instruct you that, upon this particular policy, you are to take the agreement of the parties as fixing the value of the vessel, for this, as well as other purposes. This is a new question in the courts of the United States, so far as I know, and one of much importance, and I shall keep my mind open for its more deliberate consideration hereafter, if it should be again presented; but you will take the rule to be as I have stated.

On applying these rules to the facts, as you may find them upon the evidence, if you come to the conclusion that there was not an actual total loss, you will then consider

whether the plaintiffs can recover as for a partial loss. The defendants deny their liability, because they say the vessel was not seaworthy. There is an implied warranty connected with marine policies that the vessel, at the outset of her voyage, is seaworthy for the voyage in which she is insured. This obligation is imposed, by law, on the insured for sound reasons. It takes away all temptation to expose life and property to the dangers of the seas in vessels not fitted to encounter or avoid them. It is not a contract that the owner will use diligence to make his vessel seaworthy, but an absolute warranty that she is seaworthy; and if broken the policy is made void. But, as I have already indicated, the presumption is that this brig was seaworthy, and the burden of proof is on the underwriters, by some sufficient evidence, to remove this presumption. This may be done either by proving the existence of defects amounting to unseaworthiness before she sailed, or that she broke down during the voyage, not having encountered any extraordinary action of the winds or waves, or any other peril of the sea sufficient to produce such effect upon a seaworthy vessel, or by showing that an examination, during the voyage, disclosed such a state of decay and weakness as amounted to unseaworthiness, for which the lapse of time and the occurrences of the voyage would not account.

In this case the hull of the vessel is alleged to have been unseaworthy. It must be obvious to you that there are great diversities in the strength and durability of the hulls of vessels. Some are built of the strongest and most durable materials, others of less durable materials, and not so heavily timbered, or firmly fastened. Some are quite new, others old. Some retain their original shape, others, from stress of cargo, or taking the ground, have had their original lines impaired. Yet all may be seaworthy. These diversities are known to underwriters, and they apportion the premiums which they charge to the risks dependent on the original structure, age, and general condition of the vessels they insure. But the existence of these differences in seaworthy vessels does not prove that there is no practical standard of seaworthiness. There is such a standard; necessarily expressed in general terms, but capable of being applied, by an intelligent jury, to the proofs in the cause. The hull of the vessel must be so tight, stanch, and strong as to be competent to resist the ordinary attacks of wind and sea during the voyage for which she is insured. You will apply that standard to this case.

The jury found a verdict for a partial loss.