VAN DYKE (TINKER v.). See Case No. 14,058.

———————

## Case No. 16,850.

### VAN EPPS v. WALSH et al.

[1 Woods, 598.] [1]

Circuit Court, S. D. Alabama. Dec. Term, 1870.

CONSTRUCTION OF CONTRACTS—INSURRECTION—OFFICIAL ACTS OF OFFICERS OF INSURGENT STATE—GUARDIAN'S BOND—VALIDITY—INVESTMENT OF WARD'S PROPERTY IN CONFEDERATE BONDS.

1. The obligation of a contract is what the parties intended by it when they entered into it. To ascertain the meaning of a contract, the courts are authorized to consider the circumstances of the parties at the time they made it.

[Cited in The Orient, 16 Fed. 921; Waring v. Louisville & N. R. Co., 19 Fed. 866.]

2. A probate judge in the state of Alabama, whose term of office had not expired at the date

———

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

of the secession of the state, but who held over and served out his term after the state had joined the Confederate States, and the war of secession had commenced, became a judge of the new insurgent government of Alabama, without any new election or appointment.

3. A bond was given in Alabama by the guardian of a minor after the state had seceded and joined the Confederate States, and after the commencement of hostilities between the United States and the Confederate States, conditioned that the guardian should perform all the duties required of him by law. *Held,* that the "law" referred to in the bond was the law of the insurgent government of Alabama, and that a compliance with that law by the guardian discharged the sureties on the bond.

4. When the insurgent government of the state of Alabama undertook, through its officers and laws, to appoint a guardian for the estate of an infant situate within its territory, its act was as valid and lawful as if done by a government de jure.

5. A guardian who receives assets of his ward incurs an obligation even without bond, to improve the estate and account for and pay it over to his ward, with its increase and profits.

6. He can be relieved of this obligation in one of two ways only; either by its full performance, or by discharge therefrom by a court of competent jurisdiction, authorized to act in the premises.

7. The decrees of the courts of a revolutionary and insurgent government, enforcing laws passed in support of rebellion against the lawful government, and intended to defeat the just rights of its citizens, are void.

8. The legislature of the insurgent state of Alabama, having passed December 5, 1861, an act authorizing guardians to invest the estates of their wards in Confederate bonds, and A., the guardian of B., having so invested the estate of his ward, and having, on a settlement with the probate court, made during the war, received a credit for the Confederate bonds, and at the time of such settlement, his ward being within the Federal lines: *Held,* that the settlement was not binding upon the ward, and the guardian was not entitled to credit for the Confederate bonds.

9. A decree of the court of chancery of the insurgent government of Alabama, made during the war, affecting the rights of a party who was at the time of the decree in the state of New York, is void.

In equity. This cause was submitted for final decree, on the pleadings and evidence.

Robert H. Smith, T. N. McCartney, and M. E. McCartney, for complainant.

John A. Campbell, E. S. Dargan, John T. Taylor, Peter Hamilton, and Wm. Boyles, for defendants.

WOODS, Circuit Judge. On the 16th day of April, 1861, Abram W. Van Epps was appointed by the probate court of Mobile county, Alabama, guardian of Barney H. Van Epps, the complainant, and gave bond in the sum of $50,000, with E. S. Dargan, Charles Walsh and others as sureties, conditioned that if the said Abram W. Van Epps should well and truly perform all the duties which might be by law required of him as guardian, then the obligation should be void. Under this appointment the guardian reported that he had received as assets of the estate of his ward the sum of $15,328.89. On the 10th day of

November, 1862, on the application of the sureties on the guardian's bond, Abram W. Van Epps, as guardian, filed an additional bond, in the penalty of $50,000, with E. S. Dargan and Charles Walsh as securities, with the same identical condition as the original bond. On the same day, Van Epps executed a deed of mortgage to Dargan and Walsh on certain real estate in the city of Mobile, in which, after a recital that Dargan and Walsh were sureties on his bond as guardian, the purpose and condition of the mortgage are thus set out: "Now the object of this conveyance is to protect and save harmless my said securities on my said bond, and also to secure the said Barney H. Van Epps in all sums of money I may be found indebted to him on a final settlement of my accounts as such guardian, both of which being done, that is, the full protection of my sureties and the payment of all sums to said Barney H. Van Epps, the minor, this conveyance to be null and void, otherwise to remain in full force." The mortgage further provides, as follows: "If I die before I make a final settlement of my accounts, or, if living, I make such final settlement and am found in arrear and indebted to said Barney H. Van Epps, the minor, then my said sureties or the survivor of them shall have the right to take possession of said premises and hold them for the purposes aforesaid, and to sell the same at public auction, and, from the proceeds, first to pay all the sums I may be indebted to said ward, and the residue to pay over to me or my executors and administrators, if I am not then in life." On the 8th day of March, 1864, Van Epps resigned his guardianship, and his resignation was accepted by the probate court, and on the same day, Wesley W. McGuire was appointed his successor. On the 9th day of March, 1864, Van Epps made a final settlement of his accounts, as guardian, with the probate court of Mobile county, from which it appeared that there was a balance of $15,624.14 as the assets of his ward in his hands. He was directed by the court to pay over to McGuire, his successor, all the assets of his ward, which was done in open court, and the said McGuire acknowledged the receipt thereof. The said sum of $15,624.14 was paid in Confederate treasury notes and bonds. On the 28th day of December, 1868, the complainant having reached full age, cited McGuire, his second guardian, to a final settlement of his accounts. Both parties were present by themselves and counsel, and a settlement was made, and a balance of $45.56 found in the guardian's hands, which was paid to complainant, and the receipt thereof acknowledged by complainant in open court, and complainant discharged McGuire from further liability to account for the same. It further appears that, at a partial settlement of the accounts of McGuire with his said ward, made in said probate court, on the 19th of March, 1868, McGuire reported that he had

on hand a balance of $11,758.54, Confederate treasury notes, which were declared to be of no value, and for that reason he was allowed a credit for that amount in his account. The assets received by Abram W. Van Epps of his ward's estate were in gold or its equivalent. The Confederate treasury notes and bonds which Van Epps turned over to his successor were, it is claimed, lost to the estate of the ward. After the final settlement of the accounts of Abram W. Van Epps as guardian, and his discharge by the court on March 9, 1864, Abram W. Van Epps filed a bill in the chancery court of Mobile county against Dargan and Walsh, to compel them to enter satisfaction of said mortgage given to them as aforesaid, which, on the 24th day of February, 1865, the said chancery court decreed to be done, and declared that the mortgage was satisfied and no longer of effect. In obedience to this decree and on the day of its rendition, Dargan and Walsh entered satisfaction on the margin of the record of said mortgage, in which entry they recite that the satisfaction is entered so far as they have power, and that the same was done in obedience to the decree of court. At the time of the final settlement of the accounts of Van Epps, guardian, by the probate court in March, 1864, and of the decree of the chancery court of Mobile county in February, 1865, Van Epps, the ward, was absent from the state of Alabama and was residing in the state of New York.

The object of the bill is to compel Van Epps and his sureties to pay in lawful money the balance found in his hands on March 9, 1864, and which he undertook to discharge by the payment of Confederate notes and bonds; that an account may be taken between said Abram W. Van Epps and complainant, and that payment of any balance found due complainant may be enforced out of said mortgaged premises and the said sureties on the bonds of said Abram W. Van Epps. This claim for relief is based on the allegation that the probate court of Mobile county, which on March 9, 1864, assumed to settle the account of Van Epps as guardian, and to discharge him, and the chancery court which declared said mortgage to be satisfied and directed its release, were not legal courts; that they were without authority to make such settlement, discharge and decree, and that the same are therefore null and void. Dargan and Walsh, the sureties on both the bonds of Van Epps as guardian, Wesley W. McGuire as administrator of John H. Woodcock, Wm. B. Hayden as guardian of Wm. L. Nunnalee, a lunatic, the said Woodcock and Nunnalee being sureties on the first bond of Van Epps, and Harriet McLean and James McLean, her husband, the said Harriet now claiming to hold the legal title to the premises mortgaged by Van Epps, are the defendants and the only defendants to the bill.

The first question which naturally claims

the consideration of the court is, whether the relief asked by the bill against the sureties on the bonds of Van Epps, the guardian, can be granted? It is a doctrine so well settled, that the liability of a surety is strictissimi juris; that he stands upon the letter of his bond; that his obligation is limited by the terms of his bond, as to require no citation of authorities to support it. Another rule of law just as well settled is, that the obligation of a contract is what the parties intended it to mean when they entered into it; what they both understood to be the contract, that is the contract; and to arrive at the understanding of the parties, the courts are authorized to look at the circumstances which surrounded them when they made it.

Keeping these principles in view, let us look at the surroundings of the parties to the bonds of Van Epps. The court knows as historical facts, that on the 11th day of January, 1861, the state of Alabama, represented in convention, passed an ordinance purporting to dissolve its connection with the Federal Union; that the convention proceeded to organize a state government, which denied and repudiated the authority and laws of the United States, and declared itself to be a state in a government called the Confederate States. It established and put in operation a government for the state of Alabama, which denied and refused all connection with the government of the United States. The officers of the new pretended state government were sworn to support, not the constitution of the United States, but the constitution of a government organized in opposition and in hostility to the United States, called the Confederate States. Before the first of April, 1861, this new government of the state of Alabama had driven out the forces of the United States and seized the forts and the arsenal of the United States located within its limits, and held hostile possession thereof. The new authorities of the state, prior to the first of April, 1861, had raised, armed, equipped and drilled troops to resist the power of the United States and to maintain the secession of the state from the Federal Union. All departments of the government under the new order of things were conducted in subservience to the authority of said Confederate States and recognized the new government of the state. After the 1st of February, 1861, no officers of the United States exercised or were permitted to exercise any authority as such in the state of Alabama, but were utterly excluded therefrom by the power of the state as so organized, and of the so called Confederate States of America. Before April, 1861, the Confederate States was fully organized and its government in full operation in and over Alabama and other seceding states, and its seat of government was established in Alabama, with a president and congress, cabinet and judiciary elected or appointed according to its constitution. On the 13th of April, 1861, the Confederate States commenced hostilities against the United States, and on the 15th of April, 1861, war was recognized by the president of the United States as commenced and existing between the United States and Confederate States of which Alabama was one. On the 16th day of April, 1861, not a vestige of the authority of the United States or of the government of the state of Alabama as a member of the Federal Union remained in the state. On that day a judge of the Confederate States was holding office in Mobile, the courts of the states were organized under the authority of the new state government, or acknowledged that authority and stood ready to submit to and enforce its laws. The great mass of the people of the state believed that the dissolution of bonds between Alabama and the Federal Union would be perpetual, and that thenceforth, the state would remain a member of the Confederate States, which was to hold the relation to the United States of enemies in war, in peace, friends.

In this condition of affairs the contract of these sureties was made. The obligee of the bond was John H. Hitchcock, probate judge of Mobile county. He had been elected under the old government of Alabama, and his six years' term was about to expire. He held over after the secession of the state, and served out his term. It cannot be successfully maintained that he was not a judge under the new insurgent government of Alabama. The assumption that he was not leads to consequences so absurd as to make it untenable. What then was the contract of these sureties, as understood by themselves and John H. Hitchcock, the acting probate judge? They agreed that their principal should, as guardian, well and truly perform all the duties which were or might be required of him by law. By what law? Not the law of the displaced government of Alabama, for that had in the contemplation of the parties no force. Nor by the law of the United States, for that was repudiated and could not at the time be enforced in the state. The conclusion is irresistible that their contract was based on and referred to the existing order of things and that the law by which the guardian was to be governed was the then existing law, and such other laws as should be put in force during the continuance of the trust. To suppose that they had any other law in view is too unreasonable a proposition to be for a moment entertained. If Alabama and the other Confederate States had succeeded in achieving permanent secession and independence, can there be a doubt that no question would ever have been raised as to what was meant by this contract? The settlement of the guardian in 1864, would never have been challenged, and it would not have been challenged because it would strike the universal sense that the settlement was binding and valid, and the covenants of the

sureties performed. Can it be plausibly argued that because the rebellion and secession proved in 1865 to be a failure, therefore the contract of these sureties made in 1861 and 1862, and which had been fully performed and discharged in 1864 as the parties understood it, was changed, and a different liability raised thereon? We are bound, if the language of the obligation permits, to give such effect to it as the parties, when they made it, intended to give. It is no answer to this, to say that the judge who settled the account of Van Epps in 1864, and discharged him, was not a legal officer. These sureties never agreed that the account should be settled by a lawful probate judge, as that term is now understood. They agreed that the account should be settled under what they understood at the time to be the laws of the state, and by the person who under those laws was performing the duties of probate judge, and whose authority was derived from those laws. These were the laws and these the officers, that without controversy, must have been in their contemplation when the bond was executed. Suppose that the condition of the bond had been that the guardian should settle his trust to the approval and satisfaction of the chamber of commerce of the city of Mobile, and that such settlement had been made, and the condition of the bond according to its terms complied with. These sureties would not be liable on the bond, because the chamber of commerce was not a court, and had no jurisdiction over the subject matter of the settlement, for they had fulfilled precisely what they agreed to do. In either of the cases supposed, namely, the success of the rebellion after the settlement of the guardian with the acting probate judge, or the giving of the bond that the guardian should account with the chamber of commerce, the conditions of the bond being performed according to the intention of the parties, no suit at law could be maintained on the bond. The plea of covenants performed would be a complete bar to such action. But secession failed; the insurgent government of Alabama, more than a year after the final settlement of the guardian's accounts with his ward had been made by the acting probate judge, in accordance with the laws the parties to the bond had in view, was overthrown, and the old government restored. It is now sought by this bill to make a new contract for these sureties; a contract which in all probability never entered their minds when they became sureties, to wit, that having discharged their contract according to the laws in their contemplation when they made it, they are to stand bound until their principal accounts according to the laws of the restored governments, state and national. They stand upon the terms of their bond as contemplated at the time by all parties; they have the right to say that their contract shall not be extended the division of a hair; they say they have performed their covenant according to its true interpretation, and that no action can be maintained upon it, and we think the position is impregnable. There is no equity against a surety. If at law he is released, he is released altogether.

When a court has no power to appoint a guardian, but does appoint him, and he gives bond with sureties, and takes possession of the estate of his ward, it is not competent for any of the obligors in such bond to object to its validity on the ground of want of power in the court to make the appointment. Iredell v. Barbee, 9 Ired. 250. While we recognize this doctrine, and hold the sureties concluded by a bond taken by a court not authorized to take it, still we can not enlarge the liabilities of the bond, change its terms, or extend its meaning beyond the fair intendment of the parties. In Texas v. White, 7 Wall. [74 U. S.] 733, the supreme court uses this language: "It is a historical fact that the government of Texas then in full control of the state, was its only actual government, and certainly if Texas had been a separate state, and not one of the United States, the new government having displaced the regular authority, and having established itself in the customary seats of power and in the exercise of the ordinary functions of administration, would have constituted in the strictest sense of the words a de facto government, and its acts during the period of its existence as such would be effectual and in almost all respects valid. And to some extent this is true of the actual government of Texas, though unlawful and revolutionary as to the United States. It is not necessary to attempt any exact definitions within which the acts of such a state government must be treated as valid or invalid. It may be said perhaps with sufficient accuracy that acts necessary to peace and good order among citizens, such for example as acts sanctioning and protecting marriage and the domestic relations governing the course of descents, regulating the conveyance and transfer of property, real and personal, and providing remedies for injuries to person and estate, and other similar acts which would be valid when proceeding from a lawful government, must be regarded in general as valid, though proceeding from an actual though unlawful government; and that acts in furtherance and support of rebellion against the United States, or intended to defeat the just rights of citizens, and other acts of like nature, must in general be regarded as invalid and void." When, therefore, the actual existing government of Alabama, on the 16th of April, 1861, undertook, by its officers, to appoint a guardian for the estate of an infant situate within its territory, it was doing as parens patriæ, an act as valid and lawful as if done by a government de jure, and pro hac vice, was in effect a lawful government. Neither it nor its officers can be called to account for discharging a lawful duty. If the state as parens

patriæ undertakes the duty of caring for an infant's estate, it alone can be allowed to prescribe how that trust shall be discharged, and can be called to account by no other power or person so long as its acts are not in furtherance and support of rebellion against the rightful government, or intended to defeat the just rights of citizens. On this branch of the case, therefore, I am of opinion that a probate judge of the insurgent government of Alabama might lawfully appoint a guardian for an infant's estate within its territory, and take bond for the faithful discharge of the trust by the guardian; that the bond is valid, and that, to this extent, the acts of such officer or the government under which he acts cannot be called in question. Further, that such bond must be construed, so far as sureties are concerned, according to the laws of the revolutionary government, and according to the understanding of both obligors and obligees at time of its execution.

The result of these views is, that the bonds of Van Epps, as guardian, are valid; that the guardian, having performed his duty according to the laws of the government in force when the bond was executed and the settlement of the guardian made, and as the parties to the bond understood he was to do, the sureties have performed their covenant and are discharged from further liability, and, as to them, the bill must be dismissed. Let it be understood, however, that the sureties are relieved solely upon the ground that they have performed their contract as they understood it, and as the state, as parens patriæ, acting by its officer, understood it at the time it was made. But, while the sureties on the bond are discharged, it does not follow that the guardian is clear of liability. By the reception of the property of his ward, he incurred liabilities independent of any bond, and which would attach to him without bond, and which attach to him independent of his relationship as guardian. This obligation was to improve the estate of his ward and to account for and pay it over to his ward with its increase and profits. He can be relieved from this obligation in one only of two ways, namely, by the full performance of the obligation, or by his discharge therefrom by a court of competent jurisdiction authorized to act in the premises, and whose findings and decrees are valid. When the guardian relies upon the decree of the court of a revolutionary and insurgent government for his discharge, it must appear that its proceedings were not in support of the rebellion against the lawful government, or intended to defeat the just rights of citizens. The act of the revolutionary legislature of Alabama, passed December 5, 1861, authorizing guardians and other trustees to purchase bonds of the Confederate States, or of the state of Alabama, or to receive their notes in payment of any debts due the ward, was an act in further-

ance of the rebellion, and therefore void; it gave no authority to guardians to purchase such bonds, and the decree of any probate court allowing a guardian a credit for such notes or bonds, was of effect to defeat the just rights of a citizen, to wit, the ward, and was of no binding force on him, and did not operate to discharge the guardian. The court, in attempting to make such a settlement, was no court, and its decree no decree. The decree of the chancery court of Mobile county, directing Dargan and Walsh to enter satisfaction of the mortgage made to them by Van Epps, the guardian, was also made coram non judice. The main party in interest was the minor Van Epps, who was in the state of New York, and prohibited by the laws of the United States from making any defense. It is not pretended that any actual notice was served, or could be legally served upon him, and, even if served, he could make no defense, and the purpose of the decree against him was to deprive him of the security which his guardian had given him to protect his estate. It was a decree depriving him of his just rights, and, in rendering it, the court was no court, and the decree ineffectual. Cuyler v. Ferrill [Case No. 3,523]; Buchanan v. Rucker, 9 East, 191; Borden v. Fitch, 15 Johns. 121; Newdigate v. Davy, 1 Ld. Raym. 742. We have therefore arrived at these further conclusions, that the payment in confederate notes and bonds, of the balance found due by the probate court of Mobile county from Van Epps as guardian, was not binding on his ward, the complainant, nor was the decree of the chancery court of Mobile county, directing the release of the mortgage given by Van Epps, binding on the ward, so that the ward has a just claim against his guardian for so much of his estate as was converted into confederate notes and bonds, and paid over to McGuire, the second guardian.

It has been repeatedly held by the supreme court of Alabama, that all judgments rendered by the revolutionary state courts of Alabama are void. Ex parte Bibb, 44 Ala. 140; Noble v. Cullom, Id. 554. And in the case of Bibb, the court held that the ordinance of the convention, No. 26, of 1865, dated September 12, 1865, purporting to ratify such judgments, was illegal and void. While unwilling to accept this doctrine in the broad terms laid down by the supreme court of this state, yet I am of opinion, as already expressed, that where the judgments of the courts gave effect to the legislation of the revolutionary legislatures, which was enacted for the purpose of aiding the rebellion or deprived citizens of the United States of their just rights, such judgments and decrees are void, and no subsequent legislation can make them good. The settlement of the probate court in 1864, being void as well as the decree of the chancery court, no direct proceeding is necessary to set them aside or reverse

them. They are nullities so far as they undertake to conclude the rights of complainant against his guardian, and a bill in equity in this court is a proper method for enforcing these rights. The complainant having then a just claim on Van Epps, his guardian, and the release of the mortgage given by him to Dargan and Walsh being void, it remains to consider what, if any, are the rights of complainant under that mortgage. The settlement made by Van Epps, the guardian, with the probate court on March 9, 1864, shows that he had in his hands, of his ward's money, $15,724.14. That is the balance, as struck by the probate judge. The payment of this sum or any part of it in Confederate notes or bonds was no payment. Per Walker, C. J., in Shackleford v. Cunningham, 41 Ala. 205. Now, what is the purpose of the mortgage given by Van Epps to Dargan and Walsh, as expressed in the instrument itself? It is not only to indemnify them, as his sureties, but to secure Barney H. Van Epps in all sums of money he, the guardian, might be found indebted to him on a final settlement of his accounts as guardian, and the mortgage provided, that if the mortgagor died, before final settlement, or if living, made such settlement, and was found indebted, and in arrear to his ward, the mortgagees might sell the mortgaged property and pay such indebtedness. This makes Dargan and Walsh trustees for the benefit of the minor, and as such trustees, they have a mortgage lien for the benefit of complainant on the premises, to secure him in the amount due from his guardian.

If the views we have expressed are correct, McLean and wife cannot be innocent purchasers of the mortgaged property, for the mortgage remains of record without any valid release, and that is constructive notice to them. Before, however, any decree could be made by this court, by which the lien of the complainant could be enforced on the mortgaged premises, Abram W. Van Epps must necessarily be made a party. No such decree could be made which would not directly affect him. Being a nonresident he cannot be made a party. By reason of this deficiency in the jurisdiction of this court, I am unable to see how any relief can be given complainant as against Abram W. Van Epps and the mortgaged property. The bill must, therefore, be dismissed as to Dargan and Walsh and the other sureties on the bonds of Van Epps, and as to McLean and wife and Dargan and Walsh, as trustees under the mortgage, the bill is dismissed without prejudice. Decree accordingly.