## THE ORIENT.[*]

## BAKER and others *v.* MERCHANTS' MUT. INS. CO.[*]

*(Circuit Court, E. D. Louisiana.   June, 1883.)*

**1. SEAWORTHY.**

Seaworthy, in the sense used, means in such a condition of strength and soundness as to resist the ordinary action of the sea, wind, and waves during the contemplated voyage. A ship is seaworthy, in this sense, when her hull, tackle, apparel, and furniture are in such a condition of soundness and strength as to withstand the ordinary action of the sea and weather.

**2. SAME—BURDEN OF PROOF.**

Where it was established that the vessel was sound and seaworthy for two years previous to her loss, and that she was wrecked in a cyclone, the burden of proof is upon the insurers to establish, satisfactorily, the alleged unseaworthiness.

**3. ATLANTIC OCEAN.**

The loss of a vessel wrecked in the Gulf of Mexico is covered by a policy of insurance containing a special clause by which the ship is limited " to navigate the Atlantic ocean between Europe and America;" the Gulf of Mexico being a part of the Atlantic ocean.

Admiralty Appeal.

*Richard De Gray, J. R. Beckwith, Charles B. Singleton,* and *Richard H. Browne,* for libelants.

*Thomas H. Kennedy, Joseph P. Hornor,* and *Francis W. Baker,* for defendants.

PARDEE, J.   There are two questions of fact in this case upon which the parties differ: (1) Was the Orient *seaworthy* when she left the port of Liverpool on the voyage during which she was insured?   (2) Was she *seaworthy* when she sailed from Ship island on the voyage during which she was wrecked and lost?   Seaworthy, in the sense used, means in such a condition of strength and soundness as to resist the ordinary action of the sea, wind, and waves during the contemplated voyage.   A ship is seaworthy in this sense when her hull, tackle, apparel, and furniture are in such a condition of soundness and strength as to withstand the ordinary action of the sea and weather.   See 19 How. 167; 1 Curt. 148.

"It is sufficient, on a question of seaworthiness, if the vessel was fit to perform the voyage insured, as to *ordinary* perils—the underwriters are bound as to the extraordinary perils."   2 Wash. C. C. 480.

---

[*] Reported by Joseph P. Hornor, Esq., of the New Orleans bar.
Affirmed.   See 7 Sup. Ct. Rep. 821.

And in the same case it was held:

"In considering the evidence of seaworthiness, when a rational ground is laid, as in this case, for the disability of the vessel to perform the voyage, by proof of severe gales to which she was exposed on the voyage; and more especially where, as in this case, the former condition of the vessel, for the two preceding years, is proved to be that of a sound and seaworthy vessel, the burden of proof is thrown upon the underwriters to prove satisfactorily to the jury that she was not seaworthy, and sufficiently strong to perform the voyage."

In this case of the Orient it is established beyond controversy that the Orient was sound and seaworthy for more than two years preceding, and that she was wrecked in a cyclone or storm of terrific force. The burden of proof is, therefore, upon the insurers to establish satisfactorily the alleged unseaworthiness of the Orient at the times alleged. The unseaworthiness alleged at Liverpool relates to the mizzen-mast, which is said to have been affected with dry rot to such an extent as to render it insufficient in strength to withstand the ordinary perils of the sea. The evidence offered on this point the testimony of several gentlemen that 10 months afterwards the stump of the mast showed that when it went overboard it broke nearly square off, and that the stump further showed that at the time of examination it was three-fourths affected with dry rot.

No satisfactory evidence was offered to show the rapidity or slowness with which dry rot affects timber, and the experts disagreed as to the kind of timber of which the mast was made. Against this showing it is proved that as late as the ship was inspected by the respondent's surveyor, in May following the policy, even as late as the ship sailed on her last voyage in September, there was no apparent rot about the mast, and that the mast stood well on the voyage from Liverpool to New Orleans, and on her last voyage withstood, without faltering, the unprecedented storm in which the ship was lost until her topsail was split or blown away, until the ship was thrown on her beam ends, and then until the rigging was purposely cut to send the mast overboard. Considering that the mizzen-mast is the least supported of any mast aboard the ship, as the braces run forward and the mast cannot be supported aft like the fore and main mast, and considering that the mizzen-mast in the Orient stood all the strains shown and finally had to be cut away, it is asking too much, on a theory of dry rot and the opinion of unscientific experts, to ask a court to find such a mast not sufficiently stanch and strong to withstand the ordinary perils of the sea. Dry rotted, as proctors claim, it would hardly have stood under the weight of its own spars,

and would certainly have gone over the bows on the first breath of wind when its sails were set.

The unseaworthiness alleged at Ship island, at the time the last voyage was entered upon, is in relation to the mizzen-mast, and the leaky condition of the ship. As I have considered the matter of the mizzen-mast, that may be considered out of the question. The same may be said of the grounding of the ship on the bar when first towed out of Ship-island harbor, for the ship has been brought back to this port, and now lies in the river, all of which is shown in the record, an unanswerable witness to the fact that such grounding did not impair the seaworthiness of the hull, thus overthrowing all conclusions and theories that by terrific pounding on the sand-bar her bottom was injured, so as to cause her to leak to such an extent that it was dangerous to send her to sea. The ship's condition to-day is a vindication of the board of survey that convened aboard her after the grounding, and of the report made by the diver Burris of the results of his examination following. The leakage, then, at Ship island is reduced to the causes which the libelant admits: the opening of the upper seams in the ship's sides, caused by the lying in this climate waiting for cargo, and loading, from June to September. The amount of this leakage is the only inquiry open for serious dispute.

The respondent has produced the evidence of 14 witnesses,—all of the crew,—who, in the main, swear to excessive leaking, and to extensive pumping before and after the ship sailed. An analysis of their testimony shows that except Franz, the carpenter, none of them sounded the pumps or had any accurate idea of the water the ship was making, and their statements are so conflicting and their *animus* so evident, that, outside of the facts of the ship's leaking and their pumping, very little light is obtained from them. The witness Franz had an opportunity to know the condition of the ship, and his first evidence was that the ship made 36 inches in 24 hours, and his corrected evidence was that she made 36 inches in 12 hours. The witness Nesbit says that at the time of sailing the ship made 36 to 38 inches in 12 hours, but he never sounded the pumps, and, aside from his position as second mate, there is no reason to infer that he knew any more of the actual leakage of the ship than any other seaman on the ship.' As to the pumping actually done, no man can take the statements of these 14 witnesses and reach a conclusion that should settle any rights in a court of justice. On the other side are produced the stevedore, whose men pumped the ship while she was loading, his deputy, who kept the time at the pumps, the surveyor of the

timber which was put aboard, the first mate, and the master of the ship. They all had opportunity to know the facts about which they testified, and their statements are intelligent. From them it appears that the ship made considerable water through her upper seams: according to the master, 30 to 32 inches in 12 hours; according to the mate, 36 inches in 12 hours. This amount corresponds with the corrected statement of Franz, the carpenter.

It may, then, be taken as an established fact that when the ship got her full cargo her upper seams were opened from the heat, and that through those seams she took in water so as to show three inches per hour in her pump-wells. The question now is whether such leakage rendered the ship unseaworthy. A number of experts, ship captains and others, have given opinions. The weight of these opinions and the common sense of the matter is that where a ship's seams are opened from being out of the water, and exposed to the air in a hot climate, that loading the ship down so as to cover the seams with water will soon cause them to close by the swelling of the timbers, and that a leakage from such cause is not unusual, and when within the control of the ship's pumps does not affect the ship's seaworthiness. This was practically the case of the Orient. An effort has been made to prove that the leakage of the Orient was unusual and dangerous, and beyond the control of her pumps. It has failed; the weight of evidence is the other way. Again, it has been argued that her water-logged condition aided her wreck in the cyclone. The reliable evidence in the case is that she was pumped dry at midnight; that the second mate said she was kept so during the mid watch; and that the storm struck her about 4 o'clock in the morning. Aside from the burden of proof being on the respondent, I am affirmatively satisfied, from all the evidence in this case, that when the Orient sailed on her last voyage she was in such a condition of strength and soundness in her hull, apparel, tackle, and furniture as to render her capable of resisting and withstanding the ordinary action and perils of the sea, winds, and waves for and during the voyage contemplated.

There remains in the case a question of law and fact to be determined; it is whether the policy of insurance covers risks and loss in the Gulf of Mexico. That it was the intention of the assured and the understanding of the company to cover such risks and loss is hardly to be disputed. This was the home port of the vessel, to which she was bound when the policy issued, and from and to this port has she been voyaging for several years, during which time the company has been receiving premiums from the owners, and the latter have been

confiding in the sufficiency of their policies. Whenever the ship visited this port the surveyor of the company has inspected and reported her condition. When the ship's loss in the gulf was reported in this city, before any demand was made on the company, the company, assuming its responsibility under its policy, filed a bill to perpetuate testimony as to the means of loss, to meet the demand for insurance that it knew would be made. And in the salvage case, long after a full knowledge of all the facts as to the loss and the abandonment had been made to the company, the company intervened in the salvage proceedings to ask that a separate sale of ship and cargo might be made for the protection and interest of owners.

The policy, so far as it bears on this point, reads:

" To navigate the Atlantic ocean between Europe and America; to be covered in port and at sea."

This clause is written by hand in one of the otherwise blank spaces in the policy.

" Warranted by the assured not to use port or ports in eastern Mexico, Texas, nor Yucatan, nor anchorage thereof, during the continuance of this insurance. Nor ports in the West India islands between July 15th and October 15th."

This clause is one of the printed clauses in the policy.

This latter clause shows from the contract itself that it was the intention and understanding, if not direct agreement, of the company that the insurance should cover the Gulf of Mexico, else why was the warranty required? The rule invoked, that written clauses in a contract control printed clauses, prevails only so far as there is a conflict between them. *Goicoechea* v. *Ins. Co.* 6 Mart. (N. S.) 55; *Wallace* v. *Ins. Co.* 4 La. 291; 2 Wash. C. C. 175.

So far as there is any conflict between these clauses let the writing prevail; but for all that, the latter clause was in full force between the parties, and it goes to show that the parties understood that the terms "To navigate the Atlantic ocean between Europe and America" covered the Gulf of Mexico.

Geographically the Atlantic ocean is that branch of the general ocean which separates the continents of Europe and Africa from America. See Amer. Ency. and Chamb. Ency. *verbo* "Atlantic Ocean." The Gulf of Mexico is a basin of the Atlantic ocean inclosed by the United States, the West Indies, and Mexico. See Amer. Ency. *verbo* "Gulf of Mexico;" Chamb. Id. A gulf is usually an arm of the sea which seems to have encroached upon the land, such as the Gulf of Mexico, etc. See Mitchell's Modern Geography.

"Gulf, an arm of the ocean." Ency. Britt. "All the gulfs, all the inland seas, form only portions detached, but not entirely separated, from that universal sea denominated the ocean." First Ency. of Geography, 187. "Gulf; an arm or part of the sea;" "Mexico, Gulf of; a large bay or gulf of the Atlantic." See Rees, Ency. vols. 16 and 24.

If the Gulf of Mexico is "an arm of the Atlantic ocean;" "a basin of the Atlantic ocean;" "a part or portion of the Atlantic ocean,"—it would seem not so very extravagant to hold that, in a contract where the intention of the parties run that way, it is covered by the general term "Atlantic ocean."

In Wood, Fire Ins. § 498, it is said that "conditions or restrictions contained in a policy may be considered waived by a knowledge on the part of the insurer of facts inconsistent therewith. In such cases the insurer may be estopped to insist upon the condition." See, also, U. S. v. Hunter, 15 Fed. Rep. 712. "Another rule of law, just as well settled, is that the obligation of a contract is what the parties intended it to mean when they entered into it. What they both understood to be the contract, that is the contract; and to arrive at the understanding of the parties, the courts are authorized to look at the circumstances which surrounded them when they made it." Van Epps v. Walsh, 1 Woods, 598.

For all these reasons of law and of fact, it seems that this last question must also be disposed of adversely to the respondent. On the whole case I have no doubt that the libelants are entitled to recover the full amount of the policy, and a decree will be entered to that effect, and for interest at 5 per cent. from January 4, 1883, and all costs.