## Case No. 16,944.

### The VINCENNES.

District Court, D. Maine.   1851.

SHIPPING—TITLE TO VESSELS—DISAGREEMENT· AMONG MOIETY OWNERS.

In this case there were three part owners of the vessel, one owning a moiety, and the other two a quarter each. The owner of the moiety was in possession, and was ship's husband; but the parties disagreed as to the voyage, and, on application of the two part owners of the one moiety, the vessel was ordered to be sold.

[Cited in The Annie H. Smith, Case No. 420.]

## Case No. 16,945.

### The VINCENNES.

[3 Ware, 171;.1  21 Law Rep. 616.]

District Court, D. Massachusetts.   July 17, 1858.

RES JUDICATA—SHIPPING—CHARTER-PARTY—SEA-WORTHINESS—BURDEN OF PROOF—EVIDENCE.

1. When a former judgment is relied on as a defence in the admiralty, it should appear by the record that the precise question or title set up was passed upon in a former suit, not merely that it might have been.

2. For a ship to be seaworthy for the voyage, she must be manned by a competent master and crew.

[Cited in Premuda v. Goepel, 23 Fed. 412; The· Giles Loring, 48 Fed. 470.]

3. In a libel by the owners on a charter-party, for refusing to furnish a cargo on the pretence that the ship was unseaworthy, the burthen of proving the seaworthiness is upon the owners.

4. When the question of seaworthiness is in issue, evidence of the performance of voyages, immediately before or after that contemplated is inadmissible, except so far as they may offer just inferences as to her actual condition at the time.

In admiralty.

B. F. Hallett, for libellants.
W. G. Russel, for respondent.

WARE, District Judge. This is a libel on a· charter-party. Henry Jones & Co., merchants in Boston, chartered the brig Vincennes on the 22d of December, 1853, then lying in that port. for a voyage from Baltimore to Boston. The vessel was immediately to proceed to Baltimore, where the charterers agreed to furnish a full cargo, both under and on deck, of white· oak ship-plank, of the dimensions mentioned, with treenails for small stowage, and to pay freight at the rate fixed by the contract on the· delivery of the same at Boston. The lay days for loading were to commence two days after· the master reported his vessel ready to receive·

1 [Reported by George F. Emery, Esq.]

the cargo; and then that was to be delivered as fast as it could be received and stowed by the crew, and twenty dollars a day was to be paid by the charterer for every day's detention of the vessel for default in furnishing the cargo. Under this charter the brig arrived at Baltimore, and was ready to receive her cargo the 31st of December, and began to load Jan. 2d. The loading was continued to the 6th and 7th, when she was about or nearly one-half ready, and then Abbot, who furnished the cargo, and for whom the brig was chartered, refused to furnish any more on the ground that the vessel was unseaworthy. The real reason for Abbot's refusal to proceed with the loading, it appears from the evidence, was the difficulty he found in getting insurance. The owners were informed, and negotiations were entered upon to obviate the difficulty with such success that the loading was renewed on the 20th, but was again suspended on new misunderstandings, on the 22d, and not resumed after. Abbot demanded the re-delivery of the cargo, which was refused by the master, who was preparing to sail with what he had, when on the 11th of February, the vessel and cargo were taken into the possession of the sheriff on a writ of replevin sued out by Abbot against the master. The cargo was discharged by his officers, and the brig restored to the master on the 16th. The brig was then loaded with a cargo of coal and wood, by Mr. Cunningham, a commission merchant, and sailed for Boston, where she arrived on the 15th of March.

This suit is brought by the owner of the ship against the charterer, for a breach of the covenant of the charter-party. The first ground of defence relied on, is that the subject-matter of this suit has already passed in rem judicatam in the replevin suit at Baltimore. The defense of res judicata, whether made in the form of a plea in bar, or offered as evidence on the general issue to avail this party, must be between the same parties, and the judgment must be on the same question or point that is sought to be litigated in the new action. That was a suit by Edwin A. Abbot against Allen Gatchel. The parties were not, therefore, the same. But it is said that though nominally different, there is a substantial identity between the parties to that suit and this; that Gatchel, as master of the ship, was the representative of the owner; and that between Abbot and Jones & Co., there was such a relationship of principal and agent, that one was the legal representative of the other. But even admitting this to be the case, and this objection to be surmounted, there is another difficulty that appears to me to be not easily overcome. That was a suit by Abbot founded on the right of property, and claiming the possession on the ground of his proprietory right. Gatchel pleaded, first, the general issue; secondly, a special plea denying the property to be in Abbot, alleging that it was in Jones & Co., and he claimed the rights of possession as their agent. In a third plea he claimed property in

himself. Issues were joined on these pleas, and found for the plaintiff. Nothing more appears by the record to have been necessarily decided in that case, than that the right of property was in Abbot. But this suit is founded on a contract, not touching the proprietory interest in the goods, but for their transportation; and the right of possession is claimed by the libellant under this as bailee; a right to detain and hold the goods by virtue of a lien for what was due to him on them under the contract of bailment. It does not appear that these rights of the libellant were necessarily decided in this suit. The pleading opens an entirely different ground of defence. But when a former judgment is relied on as a defence, whether presented as a plea in bar or as evidence only, I think it should appear from the record itself, that the very question, the precise title, which is the subject of litigation in the new action, was involved and decided in a former action; not that it might be, but actually was. The conclusiveness of a former judgment rests on this presumption, res judicata pro veritate accipitur, Dig. 50, 17, 207, which all know is but a legal fiction. It may be true, but it may not, and is so far from being universally true that the uncertainty of judgment, the alea judiciorum, has passed long ago into a proverb. The thousands of overruled cases in the jurisprudence of the commercial law, collected in Mr. Greenleaf's volume, it must be admitted give some countenance to the proverb. It appears to me, therefore, it is not enough to show that the title set up in this libel, might have been decided in the replevin suit at Baltimore, but that the record itself, to be a bar, should show that it actually was.

The second ground of defence is the unseaworthiness of the vessel. And this is presented under a double aspect. First, the incompetency of the master, and secondly, the unfitness of the ship itself. There is no question but that by the covenant of the charter-party, the libellant was bound to have the brig manned by a competent master and crew. The owner covenanted not only that the brig should be tight, staunch, and strong, but that she should be every way fitted for the voyage, and this includes a sufficient equipment, and a suitable master and crew. Abb. Shipp. The vessel began to receive her cargo on the 2d of January, and on the 6th, when a considerable part of the cargo had been taken in, Abbot informed the master that he should not complete her cargo on account of the unseaworthiness of the vessel. But from the evidence, the principal, if not the sole reason of his refusal at that time, was the difficulty he found in getting insurance on the cargo in Baltimore. The loading was suspended, the owners informed, and further negotiations were entered upon, and on the 20th this loading was recommenced, and again suspended on the 22d, and not resumed. Now, whatever objection to the master there might have been on the 6th and 7th, that was removed on the 10th by the

appointment of a new master, who is admitted to have been omni exceptione major. It is not, therefore, available in this suit. We are brought, then, to the actual condition of the brig in her hull, spars, and equipment. The objection in the answer is, that she was leaky, and her timbers rotten; in the technical language of the sea, that she was neither tight, nor staunch. The evidence against her as to leakiness I think fails. All vessels leak more or less, and there is a want of reliable proof that the Vincennes leaked more than vessels ordinarily do. The preponderance of proof is, I think, that she did not.

The whole question of seaworthiness, then, comes to the actual condition of the vessel. The owner covenanted that his vessel was tight and staunch, and if this is called in question on probable grounds it is incumbent on him to prove it. He only has the means of doing it as the ship is in his hands. In the matter of the seaworthiness of the ship, especially of the hull, her age is especially to be regarded. The Vincennes was an old vessel; she was built in 1833, but as is proved, and not questioned, of the best materials in the most thorough manner, with an extra amount of copper fastenings, and was considered as a first-class vessel for one of her tonnage. She was overhauled in 1843, and so thoroughly refitted that she was said to be rebuilt. In 1852–3 further repairs were made, but not so thorough as those of 1843, and in December, 1852, she was chartered for the voyage out of which this controversy has arisen. The age of the vessel, together with the want of a thorough overhauling after ten years' use, and the possible incompleteness of the repairs last made, I think, impose on the owners pretty rigorously the burthen of proving her seaworthiness, especially in her hull. And it is accordingly to this point that the principal part of the large body of testimony taken in this case is directed.

I do not propose to go into a minute and critical examination of the whole of the voluminous deposition presented. They occupied four days in the reading, and a critical examination of each would draw out this opinion to an inconvenient and tiresome number of folios. I shall advert particularly only to that part of the evidence which appears to me to have the most direct and stringent bearing to the question at issue. After the Vincennes was discharged of her cargo by the sheriff, she was taken by Mr. Cunningham, a commission merchant in Baltimore, and laden with a cargo of 150 tons of coal, and a few cords of wood on deck. She sailed for Boston on the 23d of February, and arrived there on the 13th of March, and delivered her cargo in good order. The counsel for the respondent objects to the admissibility of any evidence of voyages performed either before or after this charter, as proof of her seaworthiness at that time. I think that it is admissible so far as fair inference may be drawn from it, as to the condi-

tion of the vessel at that time, and no farther. It is very far from being conclusive, either way. This vessel performed the identical voyage for which she was chartered, and in the condition in which she then was, in weather at least of the ordinary security of that season, with a cargo that tried her strength quite as much as that for which she was chartered would, and she performed it well. This affords some, though not conclusive, ground for believing that she was fit for the voyage. She arrived at Portland, her home port, on the 17th, and on the 22d was examined by three sworn surveyors, appointed by the notary for that purpose. Two of the examiners were old and experienced ship-masters, who had been accustomed to examine vessels, and the third a master ship-builder, who rebuilt the vessel in 1843, and repaired her in 1852 and 1853. The depositions of all three were taken, and they all state that they examined her fully, that two planks of her ceiling were taken off, her timbers tried and found to be sound, and after as thorough an examination as they deemed necessary, they pronounced her seaworthy. This was immediately after she had performed the voyage for which she was chartered, with a cargo at least as trying to her strength as a cargo of lumber. Without recurring to the subsidiary proof of the libellant by which this is fortified, this must be considered as satisfactory evidence of her fitness for the voyage, unless it is overcome by opposing evidence.

The evidence to control this, relied upon as much as any part of the proofs by the counsel for the respondent, is the deposition of Mr. Clockner, of Baltimore. He has been employed for many years by the insurance offices in Baltimore, to examine vessels in that port, and report their condition to the underwriters, and his reports are relied on as a guide in making insurance on vessels and their cargoes. His employment in such a trust is a sufficient warrant of his good character and reliability. These examinations he makes and delivers to all the offices in weekly, printed reports. Two of these he has annexed to his deposition, one made March 26th, 1853, and one January, 1854. In both these, the Vincennes is marked A 2½. In his system of marking, he divides vessels into five classes, and in both these reports this vessel is put in the fourth class. In his deposition, he says, without qualification, that a vessel marked in the fourth class, is deemed fit to carry a load of lumber, and that one in the fifth class, the lowest insurable, is fit to carry such a cargo, if not heavily laden. The last of these reports was at the time when this controversy arose. After the report of Jan. 7th, Clockner was employed by Mr. Howell, president of one of the offices, to make a special examination of this vessel, why, he does not state, but probably it had some relation to the insurance of the cargo. On the second examination he made a private report to Howell that she was unseaworthy. The reason of the difference between his general and his private re-

port, was, that on his second examination he found one piece of rotten timber in one of her bow ports, which had escaped his notice in his former examination; that the Vincennes was an old vessel, and that if a timber thus exposed to the air was rotten, it furnished a presump· tion that she had other rotten timbers, less exposed, and more liable to rot. This was his only reason for reporting her unseaworthy, and the vessel being partly loaded, a thorough examination could not be made. This rotten timber in the bow port appears in many· of the respondent's depositions, and is much relied on as proof of the vessel's unseaworthiness. not as rendering her unseaworthy by itself, but as an indication that she was probably defective in other parts. To remove this suspicion, Clockner says she should have been unladen and opened, and a plank on each side of the vessel, inside and outside, taken off and the timbers exposed. This was done by the surveyors in Portland, on the inside, and the timbers were found to be sound. Dyer repaired her in 1852, and found her frame sound, and again in April, 1854, he new-sheathed her, and examined her thoroughly, and found her timber in good condition.

In connection with the deposition of Clockner, ought to be mentioned that of Capt. Hubbs, of Portland. He is an examiner for the Ocean Insurance Co. in that place, and he says that he examined the Vincennes after she was repaired by Dyer in 1852, and that he thought the repairs were insufficient to render her seaworthy. The opinion of Capt. Hubbs would carry with it more authority, but for the fact that she was marked in the books of that company, of which he was then, I think, a director, as an insurable vessel, in the grade of 2½, the same note at which she was marked by Clockner, in Baltimore. Whatever doubts or suspicions may have been suggested by this defective timber in her bow·port, the soundness of which would be naturally preserved by its exposure to the air, but which was liable to be bruised by taking in timber, is, in my mind, overcome by direct proof, and I think of a satisfactory kind, that her timbers were in fact sound. No part of her frame was found defective in April, 1854, four months after this charter, when she was fully laid open and sheathed by Dyer.

There is a large amount of testimony produced on both sides, more or less confirmatory of the positions assumed by the adverse parties, which I have not thought it necessary to comment upon in detail. When examined minutely it will be found to leave the case standing about where it rests in the deposition to which I have particularly adverted. On the whole evidence, I feel bound to say, that in my opinion the Vincennes was seaworthy. This unhappy bow port which makes so considerable a figure in many of the depositions, might not unnaturally awaken the suspicions of underwriters, and occasion some difficulty in get-

ting insurance. They are a wary and cautious people. But the owners did not covenant that the charterer could get insurance. They covenanted only that their vessel was seaworthy, and thus insurable.

The measure of damages is, I think, correctly stated by the counsel for the respondent. It is the difference between the freight received for the cargo of coal and wood, and what would have been the freight received on such a cargo of lumber as the master stipulated for in the charter-party. The wharfage or any other port charges paid by the master, is, I think, covered by demurrage.

By the agreement of the parties, the lay days for receiving the cargo were to commence two days after the brig was reported to be ready. and that then the cargo should be delivered as fast as the crew could receive and stow it. and for every day's detention by the default of the charterer, twenty dollars a day to be paid by him. The ·loading was begun on the 2d of January, and continued to the 6th, then it was suspended, and recommenced on the 20th. for two days. The brig was then about half laden. I think that fourteen ·days ought to be allowed for receiving a cargo of lumber, and being prepared to sail. This time the vessel must spend to earn the freight of the lumber, and as that by the decree is allowed, these fourteen days should be deducted from the period of detention. This would carry the time to the 16th of January. The brig was redelivered to the master after the replevin suit was ended. on the 16th of February. This will leave thirty-one days demurrage, and will amount to $620.

The case will be referred to an assessor to ascertain the amount of freight actually received for the coal and wood, and also what would have been the freight of such a cargo of lumber as the charterer agreed to furnish. and the difference added to the damages, will be the damages with interest from the time of the delivery of her cargo of coal and wood at Boston.

NOTE [from 21 Law Rep. 616]. The cause was subsequently opened for a fourth hearing, upon an error of date as to the time when the new master was appointed, it having been, in fact, the 10th of February, and not the 10th of January, as stated in the opinion. Respondent's counsel contended that seaworthiness required that a competent master should be on board all the time the vessel lay in port, and that the intemperance of the first master in port made the vessel unseaworthy, until the new master was appointed; and he claimed a deduction of thirty-one days from the demurrage. The counsel for libellant maintained that the master's competency. as to seaworthiness, means only at the commencement ·of the voyage, and not in port, and that a competent mate being on board to receive cargo, no master or crew need be on board until the vessel sailed. and he cited McLanahan v. Union Ins. Co., 1 Pet. [26 U. S.] 184. cited in Curtis. 7, 520; Weir v. Aberdeen, 2 Barn. & Ald. 320; Fland. Shipp. 64; Abb. Shipp. 421. The judge, without giving an opinion upon the point raised. allowed demurrage for twenty-six days, and decree was entered for $1,515 damages and costs, for libellant; from which respondent claimed an appeal.