## THE GILES LORING.

### SWANZY et al. v. WEBSTER et al.

### WEBSTER et al. v. SWANZY et al.

*(District Court, D. Maine.* April 10, 1890.)

1. **LIBEL—LOSS OF CARGO—CROSS-LIBEL—VALUE OF VESSEL—WHEN MAINTAINABLE.**
    In a suit by the charterers of a vessel to recover under the charter-party for damages and loss in respect to the cargo the owners may maintain a cross-libel for the value of the vessel and for freight, demurrage, etc., upon the ground that she was lost through the fault of the charterers.

2. **SEAWORTHINESS—EVIDENCE.**
    A brig built in 1865, and extensively repaired in 1884, was chartered for a voyage to the coast of Africa. She encountered no severe weather on the outward voyage, or during the four months she remained on the coast, but before leaving there she was found to be leaking badly, and to be considerably wormed, and was imperfectly repaired by tacking on lead sheets. She sailed for Marseilles with a cargo not excessive for a seaworthy vessel, and shortly after encountered a squall of no great severity. Almost immediately afterwards she was found to be leaking badly, and at once returned to the coast, where, after a survey, she was condemned and sold. She was shortly afterwards broken up, and found to be weak, rotten, and wormed, and with seams and butts open. *Held,* sufficient to show that she was unseaworthy when she left the coast.

3. **SAME—PERILS OF THE SEA.**
    Injury to a vessel by worms is not a peril of the sea.

4. **SAME—MASTER AND CREW.**
    Seaworthiness includes a competent master and crew, and upon chartering a vessel for a voyage to the gold coast of Africa it is the duty of the owners, not only to furnish a competent master, but also a mate competent to succeed him in case of his death or disability.

5. **DUTY OF MASTER—EXCESSIVE CARGO.**
    Although a charter-party provides that the whole of a vessel shall be at the charterer's disposal, with the right to put on board a full cargo, it is still the master's duty to determine when the limit of safe loading is reached, and, if an excessive cargo is put on board, the fault is that of the owners, and not of the charterers.

6. **SAME—EXPOSURE TO WORMS.**
    If a full cargo will submerge the copper on a vessel so as to expose the hull to worms, it is the master's duty to put on additional copper if it can be procured.

7. **SAME—DEATH OF MASTER—APPOINTMENT BY AMERICAN CONSUL.**
    The master of a vessel, being about to die on the gold coast of Africa, and having no mate competent to succeed him, requested the master of another vessel, belonging to the same owners, to supply some one to take charge. This was done,

·and the person furnished was appointed master by the American consul. *Held*, that this gave him authority to act as such, and the owners were liable for his man-· agement.

8. SHIPPING—LIMITATION OF LIABILITY—SALE OF CARGO BY MASTER.

The ship-owners' limited liability act (Rev. St. U. S. § 4283) applies to an unjustifiable sale of cargo by the master on the coast of Africa after his vessel has been condemned as unseaworthy.

9. SAME—EXTENT OF LIABILITY.

The extent of the liability being restricted by the act to the amount of the owner's interest in the vessel and the freight then pending, this amount must be determined by taking the values at the termination of the voyage; and when a vessel is condemned and sold before reaching her final destination, the extent of such liability is measured by her value at the time of the sale and the freight then due under the terms of the charter.

10. SAME—FREIGHT AND DEMURRAGE.

The words "freight pending," as used in the act, include demurrage due at the termination of the voyage.

11. SAME—PRIORITY OF LIENS—RIGHTS OF OWNERS.

The owners of a vessel cannot determine for themselves the priority of liens upon the fund representing their liability under the limited liability act, (Rev. St. U. S. § 4283;) and the fact that they have voluntarily paid out part of the fund in discharge of liens supposed to be superior to the claims provided for in the statute does not reduce their liability to discharge those claims to the full extent of the fund as it originally existed.

12. SAME—INDIVIDUAL LIABILITY.

Act Cong. June 26, 1884, c. 121, § 18, (23 St. p. 57,) providing that "the individual liability of a ship-owner shall be limited to the proportion of any or all debts and liabilities that his individual share of the vessel bears to the whole," applies to the liability of owners under the limited liability act, (Rev. St. U. S. § 4283;) and to the extent of the fund representing their liability thereunder they are bound, not *in solido*, but only in proportion to their respective interests in the vessel.

13. SAME—SUITS TO ENFORCE—COSTS.

When, in a suit to enforce the limited liability of the owners, the decree is against them, they are liable *in solido* for the costs.

In Admiralty. Libel by the charterers of the brig Gilès Loring against her owner, and cross-libel by the latter. Decree for libelants, and dismissing the cross-libel.

*Charles Theodore Russell, Jr.*, and *Clarence Hale*, for libelants.

*Benjamin Thompson*, for respondents.

WEBB, J. These controversies arise from a charter-party executed by Swanzy *et al.* as charterers and Benjamin Webster, agent and managing owner of the brig Gilès Loring, June 9, 1885. The brig, then lying at Boston, was chartered—

"For a voyage from Boston to ports on the west coast of Africa, between Grand Bassam and Whydah, both included, vessel at all times to lie afloat in safe anchorage, and to enter no rivers and cross no bars for discharging outward cargo, and loading a return cargo from a final port, either to Boston, united kingdom, or continent, at charterers' option; and it is understood that, during vessel's stay on the coast, charterers or their agents shall have the right to order the vessel at any time from one port on the coast to another, at such times and in such manner as they may see fit, on the terms following, that is to say:

"*First.* The said party of the first part doth engage that the said vessel in and during the said voyage shall be kept tight, staunch, well fitted, tackled, and provided with every requisite, and with men and provisions necessary for said voyage. *Second.* Puts whole vessel at sole disposal of charterers for the voyage, except necessary room for crew, sails, cables, and provision.

*Third.* The said [owners] further engage to take and receive on board the said vessel, during the aforesaid voyage, all such lawful goods and merchandise as said party of the second part, or their agents, may think proper to ship.

"And the charterers covenant and agree to hire the vessel on the terms following:

"*First.* They engage to provide and furnish to the said vessel a full and complete cargo of lawful merchandise under and on deck, or at all times sufficient ballast to continue the voyage; and it is understood that one-half of this charter is earned and payable on proper delivery of outward cargo, and that the charterers shall accept the captain's sight draft on London at $4.86 to the pound sterling for the said half; and it is understood that the charterers shall furnish the captain, while on the coast and other foreign ports, free of charge or commissions, any money needed for vessel's disbursements. *Second.* To pay for the charter or freight of said vessel during the voyage aforesaid in manner following, that is to say: $5,300 lump sum for the round voyage, if vessel returns to Boston direct; but, if vessel is ordered to Queenstown or Falmouth, for orders to discharge at a port in united kingdom, or on the continent between La Rochelle and Hamburg, $6,400; if to Gibraltar or Lisbon, for orders to discharge there, or at a port in the Mediterranean, not east of Marseilles, $6,800,—charterers to have the privilege of one port of call and one port of discharge only, port of call or discharge to be named on signing bill of lading, and forty-eight hours allowed charterers at port of call. Charterers to pay all vessel's foreign port charges, such as pilotages, lighterages. custom-house and consul's fees; balance of freight payable in U. S. currency, or equivalent, on proper delivery of homeward cargo.

"It is further agreed between the parties that there shall be allowed for the loading and discharging of the vessel at the respective ports aforesaid lay days as follows, that is to say: Ten (10) running lay days, Sundays excepted, for loading at Boston, seventy-five running lay days, Sundays excepted, for discharging and loading on the coast, commencing twenty-four hours after captain reports his vessel ready to discharge cargo; time used changing ports on the coast to count as lay days; homeward cargo to be discharged according to the custom of the port, vessel's crew to help discharging and loading on the coast, but not to go in boats for the purpose of landing or shipping cargo; and, in case vessel is longer detained, to pay demurrage at the rate of thirty-eight dollars and fifty cents per day, day by day, for every day so detained, provided such detention shall happen by default of party of the second part, or their agent.

"It is further agreed that, in going up and down the coast, vessel shall at any time charterers or their agents may desire take on board and deliver any lawful merchandise, free of charge at any factory, and in such manner as may be desired by charterers or their agents."

The vessel was loaded at Boston, with a cargo suitable for the voyage she was to make, including a deck-load of lumber, and sailed from that port June 24, 1885, with a captain, first and second mate, cook, and four seamen,—eight in all,—and arrived on the west coast August 24, making Grand Bassam as her first African port. Before the outward cargo was discharged,—indeed, while more than half still remained on board,—some small portion of the homeward cargo having been taken in, Evans, the captain, died, October 8, 1885. Before his death, knowing that his mate, though an experienced sailor, was wholly incompetent to take command of the vessel, the captain communicated with Capt.

Smith, of the brig Emma, owned largely, if not entirely, by the owners of the Giles Loring, and requested him to look after the interests of the vessel, and supply some one to take charge of her. At the time of her captain's death, the Giles Loring was lying at Cape Coast, about 18 miles from Salt Pond, where the Emma then was. Capt. Smith at once proceeded to Cape Coast, and, finding by personal examination that no one of the Loring's officers or crew was suitable for the position of captain, himself brought her to Salt Pond, that he might the better look after her. There he finally put one George Klose, who had been acting as his own second mate, in temporary command, and the brig proceeded under this officer on her business of discharging outward, and taking in homeward, cargo. Capt. Smith promptly advised the owners of the death of Capt. Evans, as did also the charterers from London, immediately upon receiving, from their agents on the coast, information of the fact. There was no communication by telegraph between the coast and England. The shortest possible communication was by steamer to Grand Cusang, a passage that was made usually in about a fortnight, and thence by telegraph to England. By mail, there were weekly steamers, and the passage was made in 23 to 25 days,—usually in 24. The dispatch communicating the captain's death was dated London, October 27, 1885, viz.: "Capt. Evans died eight. Ship lying Cape Coast, one anchor lost. Mate says cannot take ship home. Men refuse sail under him. Shall we cable engage master from steamers?" Reply, (date not given:) "Put competent man on board Giles Loring as master, and look out for vessel's business in every way. B. WEBSTER." The charterers thereupon sent out Capt. Williams to assume the position of captain, but, before he arrived on the coast, the American consular agent at Elmina, a port some seven miles from Cape Coast, had appointed Klose master. Being informed on his reaching Cape Coast of this appointment, Capt. Williams did nothing towards assuming command, or to gain control of the vessel, but at once returned to England. He was advised of the state of things by the charterers' agent at Cape Coast. Under the command of Klose, so constituted master, the brig proceeded from port to port on the coast, taking in and discharging cargo, and completed loading January 4th, and cleared and sailed for Marseilles from Quittah January 13, 1886. The cargo at this date consisted of 492 tons of palm kernels, according to the bills of lading; but as to the amount the bills of lading cannot be considered conclusive, for they were qualified by the marginal entry "quantity unknown." On the 18th or 19th of January the vessel encountered a squall or tornado, of short duration, after which she was found to be leaking badly, and she returned to Elmina, where she arrived February 4th. Here a survey was had, and the brig was reported unseaworthy. She could not be repaired at Elmina, and was finally beached and sold for £57 sterling. Before she was beached, about one-half of her cargo was transshipped by steamer calling at the port where she lay. The remainder, excepting about 40 tons, was landed. What became of the 40 tons is not plain from the evidence. The captain sold

all the cargo that was not transshipped, though he appears to testify that 40 tons were so damaged it was not salable. Some was sold at auction at sundry times, and some at various private sales. The proceeds of the sales were all received by Capt. Klose, and used to pay crew, and various expenses, or for his own necessities. This is a general outline of this most unfortunate business.

The charterers libel for damages for breach of the charter, and the owners promote a cross-libel for freight and demurrage for 45 days, for wages of laborers hired by ship, the charterers failing to furnish the men, as provided by the charter, and for the value of the vessel, alleged to have been lost by the fault, misconduct, and wrongful acts of the charterers and their agents on the coast.

It was contended on the part of the charterers that the libel of the owners is not properly a cross-libel, but, upon a ruling adverse to this claim, they entered into a stipulation to answer to any decree against them, and put in an answer. I have no doubt of the correctness of the ruling on this point, as both parties assert their claims under the charter, and on its observance or violation their respective rights depend.

The specific breaches of contract asserted by the charterers are—(1) Failure to deliver cargo, by reason of unseaworthiness when the brig sailed from Boston, in the condition of the vessel herself, and in not having competent and sufficient officers and crew. (2) Failure to keep the vessel in a seaworthy condition during the voyage, and sailing for Marseilles when it was known that the brig was unseaworthy. (3) Failure to forward the cargo from Elmina after the brig had been condemned, though vessels could have been easily and readily procured to carry it. (4) The unjustifiable sale of the cargo by the master after the voyage was broken up.

The owners contend that the brig was seaworthy when she sailed from Boston in every respect, save the want of a competent mate, and that this failure did not contribute to the subsequent loss; that if the vessel afterwards became unseaworthy, it was because of the wrongful acts of the charterers in overloading for the outward passage, and in unduly detaining the vessel on the coast, and keeping on board of her the outward cargo; that the want of a suitable master after the death of Capt. Evans was through the fault of charterers in not providing a proper person, as they are alleged to have undertaken to do; that the vessel was seaworthy when she set out from Quittah for Marseilles; that the failure to perform the charter was caused by perils of the sea after sailing for Marseilles; that they had never authorized Klose to act as captain, nor recognized him as such, or as in any way their agent; and that his possession of the vessel was through the fault of the charterers or their agents, and that for his wrongful acts and omissions they are in no wise responsible.

The Giles Loring was built in 1865, and in 1884 received extensive repairs, after which she was given a class of A 1½. On her outward passage the evidence shows she leaked some, but not enough, without

other facts, to show that the vessel herself was unseaworthy at the date of the charter, or when she sailed from Boston. Neither does the evidence seem to be sufficient to justify any conclusion that there had been any material injury to the vessel by worms up to that time. The evidence as to the weather on the outward passage is slight and somewhat vague. The log-book has not been produced, and the only witness is the mate, Grant. From his testimony it is to be inferred that the passage out was with favorable weather, and that neither winds nor seas to test the strength and sufficiency of the vessel were encountered. But after she had been for a time on the coast, without, so far as appears, any more severe weather, the leaking greatly increased, and before she set sail for Marseilles she was found to be wormed and in part rotten. Grant testifies that in his judgment she was not seaworthy for the passage to Marseilles. He says he so told Klose, then in command. Klose does not deny that Grant so told him, but only says he has no remembrance of it. It is certain that some repairs were made by caulking, and by tacking on sheet-lead above the copper. Nothing very thorough appears to have been attempted. Better material than sheet-lead could have been procured; indeed, Capt. Klose at one time ordered copper or metal, but, finding the leak diminished by the use of the lead and the caulking that had been done, did not use it. Though the presumption is in favor of seaworthiness, and the burden is on the party denying it by some sufficient evidence to remove it, this may be done by proving the existence of defects amounting to unseaworthiness before she sailed, or that she broke down during the voyage, not having encountered any extraordinary action of the winds and the waves, or any other peril of the sea, sufficient to produce such an effect upon a seaworthy vessel, or by showing that an examination during the voyage disclosed such a state of decay and weakness as amounted to unseaworthiness, for which the lapse of time, and the occurrences of the voyage, would not account. *Bullard* v. *Insurance Co.*, 1 Curt. 155. The evidence of this character is that the brig sailed from Boston June 23d, arrived on the coast August 23d, without experiencing heavy weather; that she remained on the coast, going from port to port, and at no time taking ground, till January 4th following; that before this last date she was found to be leaking badly, and to be considerably wormed; that she was imperfectly repaired; that while on the coast she had no severe trials of wind or sea; that she sailed with a cargo not excessive for a seaworthy vessel of her capacity; that in about 14 days after sailing she met a squall of short duration, and no great severity, and almost immediately was found to have three feet of water in her hold, and almost constant pumping was necessary; that she reached Elmina in about 16 days of moderate weather, and there, upon a survey, was condemned and sold; that not long after her sale she was broken up and found to be weak, rotten, wormed, and seams and butts open. This, taken in connection with her age, leads me inevitably to the conclusion that, notwithstanding the efforts of the owners in 1884 to repair and make her strong, she was un-

seaworthy before she had finished loading on the coast of Africa. I do not deem it important to determine whether she was seaworthy when she sailed from Boston, for, by an amendment of the libel, all claim for damage on the outward cargo has been abandoned, and there is no pretense that any damage was suffered by the homeward cargo, as long as it remained in the ship. Indeed, the libelants constantly maintain that palm kernels, of which that cargo consisted, are not injured by exposure to salt water, unless very long continued.

The condition of the vessel is claimed to have been occasioned by overloading at Boston, and by subsequent improper treatment on the coast, where it is said such proportion of the outward cargo was kept on board while the homeward cargo was being laden as to overload her, and that in this way beams were broken, strains were produced, and the hull kept submerged below the copper, and exposed to worms, all by the fault of the charterers and their agents. This argument practically concedes the insufficient condition of the vessel, but, admitting that the particular method of loading and unloading were as claimed, it does not exonerate the owners. The charter obliged them to take a full cargo, and entitled the charterers to put such cargo on board, and for breach by either in this respect an action could be maintained. It gave no right to overload, nor compelled the receipt of so much as would endanger the safety, or exceed the proper carrying capacity, of the brig. But it was for the master to determine when the limit of safe loading was reached. The quantity and storage of cargo was subject to his control. If more was offered than was consistent with safety, he should have declined to accept it. The charterers were not responsible for the captain's management. "If the master or sailors ship a larger cargo than is proper, they are considered in fault, and are liable for damages. Even if shipwreck ensue in consequence of the ship being too heavily laden, they are responsible." Ingersoll's Roccus on Ships and Freight, note, XXX.; Moll. De Jur. Mar. bk. 2, c. 2, § 5; *Weston* v. *Minot*, 3 Woodb. & M. 436, 446–448; *Hunter* v. *Fry*, 2 Barn. & Ald. 421, 426; Sea Laws, 448, which may be found in 2 Pet. Adm. Append. p. 76; Jac. Sea Laws, bk. 2, c. 2, p. 94, § 4.

This duty of the master also required him to see that his vessel was not loaded so deeply as to expose the hull to worms above the metal; and, if a full cargo would so settle his ship, he should have guarded against the danger by an addition to the copper, if it could be procured, and that it could, is shown by the evidence. It further appears that the copper was 11 to 11½ feet high, and that the load draft of this brig was 13 to 13½ feet. So with a full load, two feet or more of her planking would be unprotected. Injury by worms is not a peril of the sea. *Rohl* v. *Parr*, 1 Esp. 445; *Hazard* v. *Insurance Co.*, 1 Sum. 218, 8 Pet. 557; *Martin* v. *Insurance Co.*, 2 Mass. 420. "Where the owner of a vessel charters her, or offers her for freight, he is bound to see that she is seaworthy, and suitable for the service in which she is to be employed. If there be defects, known or not known, he is not excused. He is

obliged to keep her in proper repair, unless prevented by perils of the sea or unavoidable accident." *Work* v. *Leathers*, 97 U. S. 380; *Hubert* v. *Recknagel*, 13 Fed. Rep. 912; *The Casco*, Davcis' Ware, 192; *Putnam* v. *Wood*, 3 Mass. 485. Independently of this obligation by law to keep in repair the vessel, the owners, by express undertaking in this charter, took on themselves that duty and burden.

If it is considered that the absence of a competent master occasioned the loss, the responsibility does not rest on the charterers. It was the duty of the owners to provide for such a contingency as the death of a captain, especially on a voyage to the gold coast, by employing a mate competent to take the place. *Richardson* v. *Winsor*, 3 Cliff. 395. Seaworthiness includes competent master and crew. *The Vincennes*, 3 Ware, 171. It is true that upon learning the death of the captain, and the incompetency of the mate, they made honest and prompt effort to supply the deficiency, by invoking the aid of the charterers; and the charterers, in their turn, in good faith endeavored to comply with the appeal to them, and sent out a captain to take charge. The failure of the person thus sent out was not any fault of the charterers. After they had selected him, and given him instructions in behalf of the owners, he was the agent of the owners, appointed at their request. If he had any authority as master under that appointment, he was, as master, the agent of the owners, and they were responsible for him. But no blame can properly be cast on him. He found on his arrival that a master had been appointed by Capt. Smith, to whose charge Evans, when dying, committed the interest of his vessel, and by the American consul, which appointment gave Klose authority to act, and made the owners liable for his management of their vessel. *The Jacmei Packet*, 2 Ben. 109; Maclachl. Shipp. 158; *The Zodiac*, 1 Hagg. Adm. 320; *The Alexander*, 1 Dod. 278; *The Kennersley Castle*, 3 Hagg. Adm. 1–8; *The Rubicon*, Id. 9; *The Tartar*, 1 Hagg. Adm. 1.

The failure to perform the charter being through the fault of the owners in not providing a vessel that was seaworthy, and in not keeping her so during the voyage, they are liable for the damages arising from that fault. The amount of damage must be decided on reference to a master; and, on the coming in of the report, the question of limitation of liability raised by the owners' answer will be properly presented.

From what has been said, it follows that the claim of the cross-libel for damages and injury to the vessel by misconduct of the charterers must be pronounced against. But the freight and demurrage and sums paid laborers may be regarded in considering the question of damages. Those matters are therefore left for further discussion on the report of the master.

### ON MASTER'S REPORT.

#### (July 24, 1891.)

WEBB, J. The report of the assessor contains so full a finding of facts that, while not accepting or approving his conclusion in respect to dam-

ages, the court has in it all the *data* necessary for determining the amount of the decree. When the liability of Webster *et al.* under the charter was decided, the questions of demurrage and of limitation of liability were explicitly reserved for further argument on the coming in of the report, and they are now to be finally passed upon, in connection with the sum to be decreed in favor of the prevailing party.

No error is found in the assessor's determination as to the fact or the amount of demurrage, and the same is approved. But I cannot confirm his conclusions in regard to damages. He correctly holds that the action of the master, Klose, in selling any portion of the cargo was unjustifiable, and was without the knowledge or authority of his owners, and that it has not since been ratified or adopted by them. From this unwarranted and wrongful conduct of the master no small part of the loss arose.

I concur in the conclusion of BROWN, J., in *The Amos D. Carver*, 35 Fed. Rep. 665, and followed by NELSON, J., in *McPhail* v. *Williams*, 41 Fed. Rep. 61, that "the act of 1884, limiting the liability of the owners of a vessel on account of the same, does not restrict the liability of owners upon their own personal contracts, but only their liability on account of the vessel." But this interpretation of the statute does not make them liable without limitation for violation of his duty on the part of the master. The sale of the cargo by him was wholly apart from the owners' contract. It is indeed true that by reason of the contract he had the opportunity to meddle with the property of the charterers; and it may be, that, inasmuch as the necessity for landing the palm kernels or removing them from the Giles Loring would not have existed had the owners performed their contract that the ship should be seaworthy, they, in the absence of any law limiting their liability, would have been responsible for all the subsequent loss. But here we have a special loss from an independent cause,—the misconduct of the master,—for whose tortious acts the owners are liable only to the extent of their interest in the vessel and pending freight. The argument has been pressed that the owners of the vessel, under the charter, became bailees for hire, and responsible for the safe delivery of the cargo against all hazards, the acts of God, public enemies, and perils and dangers of the sea alone excepted. To so hold would annul the statute exonerating owners from liability to respond beyond a limited measure for the fraudulent doings of others. The act of March 3, 1851, embodied in Rev. St. §§ 4282–4284, added to the excuses and accepted risks of the carrier or bailee. "This language is broad, and takes away the quality of warranty implied by the common law against all losses except by the act of God and the public enemy," is the emphatic expression of SAWYER, J., in *Lord* v. *Steam-Ship Co.*, 4 Sawy. 301. Would the owners have any the less been bailees, or have stood in any different relation to the cargo, if their vessel, being in every respect stanch, seaworthy, and fit for the voyage, had encountered violent and continued storms, and had been by the winds and the sea driven ashore and helplessly wrecked? or if the loss had been caused by fire, or by the willful and criminal embezzlement of

the master, mates, or seamen? Yet it would not probably be contended the owners, though bailees and carriers, were liable for losses so occasioned, if "done, occasioned, or incurred without their privity or knowledge," exceeding "the amount or value of" their "interest in the vessel and the freight then pending." In this case the facts forbid suspicion of such privity or knowledge. The vessel was on the west coast of Africa; the owners were in the United States, at this city of Portland. The captain of their appointment had died of the coast fever. They had taken measures to provide a suitable successor. Without any previous notice to them, and without their knowledge, the American vice-consul had assumed to place Klose in command of the vessel. As far as appears, Klose did not communicate with his owners, who could not be reached directly by telegraph, but took his instructions and advice from the vice-consul who appointed him,—if indeed he acted upon any advice, and not of his own motion. The owners have not in any way ratified or approved his doings. There can be no pretense of privity or knowledge on their part. Under such circumstances, the owners are entitled to the limitation on account of losses "done, occasioned, or incurred" by the unwarranted and wrongful proceedings of this captain, thus thrust upon them, though he was still their captain, for whose authorized acts they were answerable.

Then what were those losses? They can be nothing but the value of the palm kernels sold to third parties, and the expense incurred by Burnett, the charterers' agent, to regain possession for them of the 110 tons of the cargo. These are the only losses attributable to the wrong-doing of the master. All expenses attaching to those 110 tons besides the amount paid at the sale to secure them are the same as they would have been if no sale had been attempted, and must be carried to the account of loss arising from the breach of charter as to seaworthiness of the vessel. By statute the limited liability is measured by the value of the ship and freight pending. These values are to be taken at the time of the termination of the voyage. In this case the voyage terminated at Elmina, when the brig was condemned and sold. *The City of Norwich,* 118 U. S. 468, 6 Sup. Ct. Rep. 1150; *The Scotland,* 118 U. S. 507, 6 Sup. Ct. Rep. 1174; *The Great Western,* 118 U. S. 520, 6 Sup. Ct. Rep. 1172. By the charter-party one-half of the freight was earned and payable on right delivery of the outward cargo from Boston to the west coast, and that half was accordingly paid. The other half was freight pending when the voyage terminated, and would be earned only on delivery of the cargo at its destination, before which it was of no value to the owners. *The City of Norwich,* 118 U. S. 491, 6 Sup. Ct. Rep. 1150. As that portion of the freight was never earned, nothing is to be added on its account to the value of the vessel, for the purpose of showing the amount of the owners' liability. The only evidence as to the value of the vessel is that as to the price at which she was sold. No suggestion has been made of the inadequacy of that price, nor anything offered to excite the belief that the value exceeded the £68. 19s., the gross proceeds of sale. This in United States currency is equal to $335.09.

We have also the demurrage to be considered. The finding of the assessor in respect to it and its amount is approved. But, in respect to the limitation of liability, it should be regarded as freight pending. It was an amount due from the charterers to the ship-owners for the prolonged use of the vessel. . Though not technically freight, it partakes so much of the same character that it must be held subject to the same rule. It represents the earning of the vessel during the voyage or charter, in the performance of which losses were caused by the misconduct of the owner's agent, the master, for which, but for the limitation of the law, the owners would have been fully liable. There is no reason for allowing them to collect and retain it, free from all duty of giving the benefit of it to innocent losers. "Demurrage is only extended freight." *Hall* v. *Barker*, 64 Me. 343; *Jesson* v. *Solly*, 4 Taunt. 53. "'Freight' signifies the earnings or profit derived by the ship-owner, or the hirer of a ship, from the use of it himself, or by letting it to others, or by carrying goods for others." *Minturn* v. *Insurance Co.*, 2 Allen, 87, 91; Phil. Ins. § 327. "Taking all things into consideration, we are of opinion that this sum allowed in the name of demurrage ought to be considered in lieu of the earnings of the vessel which were lost by the detention." *Coggeshall* v. *Read*, 5 Pick. 454, 460. "All hire or reward for the use of vessels is freight." Ben. Adm. § 286.

The answer contains a statement that the proceeds of the sale of the vessel were appropriated to the discharge of liens of higher rank than the claims of the libelants. It is not for the owners to determine the priority of claims, or the distribution of the fund representing their limited liability. Neither is it their privilege to pass upon the question whether they are entitled to such limitation. There is a proper course for them to pursue if they seek the protection the law provides against all claimants. They have not pursued that course, nor indicated, except by the statement in the answer referred to, that there are any claims against them on account of this vessel, arising since the execution of the charter in this case, other than those of the libelant demanded in these proceedings. As to these demands they ask the benefit of the limitation. They can have a limitation, but cannot, by their voluntary act in disposing of a portion of the fund reserved for the satisfaction of their liability, restrict still more the limitation, or adjust the demands of claimants upon the fund.

Though I am of opinion, and decide, that, for the purpose of ascertaining the measure of liability, the demurrage due and unpaid must be treated as pending freight, yet in this case, the only party demanding damage being the same who is to pay the demurrage, the point is of little account, as, to this extent, the liabilities cancel each other. Had the limitation affected several creditors, the amount of the demurrage would make part of a fund for *pro rata* distribution.

Then, deciding that the owners of the ship are entitled to a limitation of liability as to the losses occasioned by the tortious acts of the master, and that the libelants, being the only creditors shown, are entitled for those losses to recover the whole amount of the value of the vessel and

the pending freight, and also that the owners of the brig Giles Loring are liable for all damage caused by their own breach of contract, and that the charterers are liable for the demurrage to the amount of $731.50, the computation is as follows:

DAMAGES CAUSED BY BREACH OF CHARTER.

| | | |
|---|---|---|
| 78 tons palm kernels, wholly lost, | $3,553 87 | |
| Forwarding 226 tons freight, | 2,328 18 | |
| "        110  "   at same rate, | 1,133 18 | |
| Expense bagging and shipping 226 tons, | 710 17 | |
| "    shipping and storing 110  "  | 140 94 | |
| | $7,866 34 | |
| Less charter freight saved. | 3,398 00 | $4,468 34 |

LIMITED LIABILITY ON LOSS BY TORT OF MASTER.

| | | |
|---|---|---|
| Value of the vessel, | $ 335 09 | |
| Pending freight, | 731 50 | |
| | $1,066 59 | |
| Less demurrage due from charterers, | 731 50 | 335 09 |
| | | $4,803 43 |

As to costs, those on libel and cross-libel will be set off, and decree for the excess in favor of the party whose costs are greatest.

The only matter remaining for determination is whether the respondents are liable *in solido*, or only in proportion to their respective ownership in the vessel. The act of June 26, 1884, (chapter 121, § 18, 23 St. p. 57,) fixes the rule "that the individual liability of a ship-owner shall be limited to the proportion of any or all debts and liabilities that his individual share of the vessel bears to the whole;" and the question is presented whether this limitation, like that which is measured by the value of the vessel and pending freight, is to be confined to the liability of owners "on account of the vessel;" that is, "the liability imposed on them by law in consequence of their ownership of the vessel," and incurred "without the owners' express intervention." Though the relation of part owners to each other is that of co-tenants, yet as to third parties they have made in law but one owner. It has been considered that in the employment of the common property they are *quasi* partners; because of their joint interest in the vessel, they have been held *in solido* on liabilities to strangers, whether arising from contract or tort. This statute was evidently designed to modify in some way the liability previously imposed on them by law, and to relieve ship-owners of some portion of that liability. The intention to accomplish this, in part, by breaking up the solidarity of responsibility, is plain. Relief in this way is not in terms made to depend on the condition that the owners are in position to take advantage of the other portion of the statute, and be discharged of all liability beyond the value of their shares of the vessel. The burden of a part owner, who can free himself from debt or obligation by the surrender of his interest in the vessel, did not more urgently

appeal to be lightened than that of him who must respond to the full extent of the liability, however small the value of his property. The language of the statute does not require any different rule of responsibility for the different state of facts under which the obligation is incurred. The well-known object of this statute was the increase of American shipping by a reduction of the burdens of ship-owners. That end would be promoted by discharging part owners from a liability *in solido* for the debts of each other. A construction giving such discharge is consistent with the language of the act, conforms with the intention of congress, and regards strictly the defect to be corrected. No principle of interpretation requires a different construction to the first clause of this section 18, and no other construction gives to it an effect so salutary and so helpful to owners, whose interests it aimed to serve. The aggregate liability of the owners in this case, after deducting the amount above allowed for demurrage, and including interest from date of filing the libel to this July 24, 1891, when the final decree is entered, is $6,139.65. The decree is ordered to be against each part owner for the proportion of this amount that his individual share of the vessel bears to the whole.

The costs must be differently dealt with. They cannot be treated as a liability or debt of the owners, as owners, but are expenses of litigation for which the owners contesting are held *in solido*. Let it be so decreed.

IN THE CROSS-LIBEL.

A decree in favor of libelants for demurrage in the sum of $731.50, and costs.