In re MEYER et al.

(District Court, N. D. California. February 10, 1896.)

No. 11,111.

1. ADMIRALTY—LIMITATION OF LIABILITY—JURISDICTION.
    It is sufficient to give jurisdiction to the district court, in a proceeding for limitation of liability under Rev. St. §§ 4283–4285, that some of several joint owners of the vessel, whose shares were uninsured and so could not be sold at an underwriter's sale, have transferred their title in what remains of the vessel to the trustee; and, having such jurisdiction, the court has the equitable power to compel the petitioners to bring in the money obtained for the insured interests and that for freight and passenger fares, in order to enable it to carry out the provisions of the statute.

2. SAME—DELAY.
    The owners of a vessel do not waive their right to institute proceedings for a limitation of their liability for the loss of property shipped on board her, by waiting to do so until after proceedings have been commenced in a state court to recover damages.

3. SAME—SEAWORTHINESS.
    Upon an examination of the evidence as to the condition of a vessel, in respect to strength of timbers, repair of old injuries, existence of latent defects, etc., and as to the cause of her being totally lost in attempting to cross the bar at the entrance to Coos Bay, Cal., held, that the vessel was in a condition, when she sailed, to encounter the ordinary perils of her voyage, which was sufficient to make her seaworthy, and her loss was due to the mistake or carelessness of the captain, without the fault, knowledge, or privity of the owners, in attempting to cross the bar on an ebb tide.

4. SAME—PILOT'S LICENSE—PRESUMPTION.
    When, in a proceeding for the limitation of the liability of the owner of a seagoing, coastwise vessel, involving the question of the competency of the captain, it is shown that such captain is a licensed shipmaster,

and no evidence whatever is given as to whether or not he is also licensed as a pilot, under Rev. St. § 4401, or whether or not a licensed pilot was on board the vessel, the court will be justified in presuming that the captain was a licensed pilot, and that the law in that respect was complied with.

5. SAME—SUFFICIENT CREW.

A statement, in the certificate of inspection of a steam vessel, that her complement shall be a master, two mates, two engineers, and twelve crew, does not necessarily mean that the "twelve crew" shall be sailors only, excluding fireman; and if there is no evidence that the vessel had not sufficient officers and crew at all times to manage the vessel, she is not to be deemed unseaworthy in her crew, because she had fewer than twelve sailors.

6. SAME—DEVIATION—HARTER ACT.

The steamer E., on a voyage from San Francisco, found the steamer B. stranded and in a dangerous position. She pulled the B. off the rocks, and towed her to the nearest harbor, where she pumped out. This harbor, though safe at the time, was exposed to the winds, and liable to become dangerous to a vessel of the size of the B. and in her condition; but two tugs were present in the harbor, which were fully able to assist the B. and tow her to San Francisco. The E., however, after helping the B. to pump out, towed her back to San Francisco. Held, that the E.'s deviation, in towing the B. to the harbor where she pumped out, was for the purpose of saving life and property at sea, and justifiable under section 3 of the Harter act (27 Stat. 445), but that the further deviation, in towing her back to San Francisco, after she had been made safe by the presence of the tugs, was unjustifiable.

7. SAME—OWNER'S KNOWLEDGE.

Under Rev. St. §§ 4283–4285, and the acts amendatory thereof and supplemental thereto, including the Harter act of February 13, 1893 (27 Stat. 445), one of several joint owners of a vessel, who has knowledge of or is privy to an unjustifiable deviation of such vessel from her voyage, is liable for any loss or damage to property shipped on board, which occurs subsequently, during the same voyage, in the proportion which his share of the vessel, at the time of the affreightment, bears to the whole loss or damage; but such of the joint owners as had no knowledge of or privity to such deviation are entitled to avail themselves of the provisions of the statutes for limitation of their liability to the value of the vessel at the end of the voyage.

8. SAME—SALVAGE.

The words "freight pending," in the statutes relating to the limitation of the liability of shipowners, do not include salvage earned during the voyage.

Page & Eells, for petitioners.

Andros & Frank and Crandall & Bull, for respondents.

Platt & Bayne, for respondent Smedberg.

HAWLEY, District Judge. This is a proceeding for limitation of liability, by petition of the owners of the steamer Emily, under sections 4283–4285, Rev. St. U. S., and the various acts amendatory thereof and supplemental thereto, especially the act of June 26, 1884 (23 Stat. 53–60), the act of June 19, 1886 (24 Stat. 79–83), and the act of February 13, 1893 (27 Stat. 445). Prior to the filing of this petition one Isaac Lando, a shipper of merchandise on the last voyage of the Emily, and as assignee of various other persons, shippers of goods thereon, and as administrator of the estate of C. Robinson, deceased, whose life was lost at the time of the wreck of the steamer, commenced suit in the state court; and, at the time of

filing this petition, the usual monition and injunction against further proceedings in the state court were issued in accordance with the practice of this court in such cases. The petition alleges that the steamer was lost, on a voyage to Coos Bay, in July, 1893, owing to the perils of navigation, without fault of the owners of the steamer or her officers of which they had any privity or knowledge. The steamer was wrecked on the bar at Coos Bay. Her remains were turned over to a trustee and sold at underwriters' sale for $130. The amount of freight earned on her last voyage and fares collected from passengers is not stated in the petition; but these assets, if such they be, were by a subsequent petition tendered to the court to await its decision on the question of liability. The Emily left San Francisco on July 7, 1893. On July —— she rendered salvage services to the Bawnmore, first towing that ship into Caspar creek, and thence to San Francisco. On July 14th she again left for Coos Bay, and on this latter voyage, on the 17th day of July, while attempting to cross the bar at Coos Bay, she struck, lost her rudder, became unmanageable, and was totally lost.

The contention of petitioners is (1) that they are exempt from liability; (2) that, if liable at all, they can only be held to the extent of the value of the wrecked steamer and freight pending. The limitation of the liability of owners is opposed on numerous grounds. Respondents contend that the petitioners are liable for the loss, independently of the limitation acts: (1) Because the Emily was unseaworthy in her hull. (2) That she was unseaworthy in her master and crew. (3) Because of the unlawful deviation from her voyage in bringing the Bawnmore to San Francisco; that such deviation, if allowable at all, under the act of February 13, 1893, was allowable only to the extent of taking the Bawnmore into Caspar creek; that, by towing the Bawnmore to San Francisco, the owners became insurers of the goods for the voyage, and cannot plead any limitation. (4) That, if the owners had not privity and knowledge, still their right to limit their liability is waived by their delay of over a year before beginning these proceedings. (5) That this court has no jurisdiction, because it was not, at the time of the filing of the petition, possessed of any of the elements of jurisdiction, to wit, the res,—the fund to be distributed. (6) That, if not liable in solido, they are in any event liable for the value of the steamer, her freights then pending, including fares; and that salvage earned on her voyage must be construed as freight, etc. It is conceded that, in proceedings of this character, the owners may assert and prove their entire exemption from any liability; that, if a liability exists to the extent of the value of the ship and freight, it is the value after the disaster, and freights, including passenger fares, collected; that the insurance money is not included in the value; that under the maritime law, previous to the enactment of the acts of 1884, 1886, and 1893, a warranty was implied that a ship should be seaworthy at the inception of the voyage, and that the defect, although it might be latent, was no defense to an action for damages caused thereby to goods or passengers; also, that a competent master and competent crew were neces-

sary to the seaworthiness of a vessel, and that deviation for salvage purposes made the shipowners thereafter responsible as insurers of the cargo of their ship. These contentions, and the facts disclosed by the evidence, involve the entire life and history of the Emily, and call for a construction of the various acts of congress, as well as the general principles of the maritime law.

Before proceeding to discuss the merits, some of the preliminary questions will be disposed of. The objections urged to the jurisdiction of the court, upon the ground that, at the time of filing the petition for limitation of liability, the court was not possessed of the fund to be distributed, are not well taken. It is alleged in the amended petition, and admitted upon the trial to be true, that a number of the owners of the Emily, whose names are stated in the petition and amendments thereto, were uninsured. The transfer to the trustee passed their title to whatever remained of the vessel. Their interest could not be sold by the underwriters, and it is still in them. This fact is sufficient to give the court jurisdiction, and, having jurisdiction, it certainly possesses the equitable power to compel petitioners to bring in the money obtained for the insured interests, and the money for freight and passenger fares, in order to enable it to carry out the provisions of the limited liability acts, if necessary so to do. The jurisdiction of the court attached when it obtained possession of any part of the res, and the court has the power to order the remainder to be brought in, and amendments will be allowed at any time for that purpose. The owners did not waive their right to file a petition for limitation of liability by waiting until after the proceedings were commenced in the state court to recover damages. It is true they might have instituted these proceedings before they were sued (Ex parte Slayton, 105 U. S. 451); but they were not compelled to do so (Ben. Adm., 3d Ed., §§ 558, 560).

Respondents claim that W. R. Smedberg, administrator of the estate of John W. Adams, deceased, which estate owned one-sixteenth of the Emily, and who at their instance has been made a party to this proceeding, is personally liable for damages for the loss of the steamer, upon the ground that he was in possession of said interest, and personally engaged in the business of affreightment by means of the steamer, and had entered into contractual relations with the persons represented by respondents, and that Meyer, the managing owner of the Emily, was his agent in the premises. This position is not supported by the facts, and the claim, as made, is untenable. Smedberg testified that he was the administrator of said estate; that the estate had been closed and a decree made on the 29th of August, 1893, distributing the property of the estate; that the property had all been turned over to the heirs of the estate; that on September 21, 1893, he was discharged as administrator; that, during his term as administrator, he never caused any employment to be made, or himself employed any one, in connection with the schooner Emily, and had nothing whatever to do with it, and did not individually have any interest in the schooner, or any business with her whatever; that his only relation with her

was as the administrator of the estate; that the one-sixteenth interest in the schooner was one of the assets of the estate at the time he was appointed administrator, and was included in the inventory; that he received and distributed two or three dividends from the Emily; that the only knowledge he had as to who were the agents or managing owners of the schooner came from the fact that he received a notice to call upon Mr. Meyer and get some money (dividends) that belonged to the estate of Adams. Under the law of California the administrator is entitled to have possession of any property left by the deceased, but the surviving owners of the Emily were in possession of the schooner and were entitled to the possession. Their possession was for the benefit of the heirs of the estate of Adams. The administrator had no ownership in the vessel, and was not individually liable for the conduct or contracts of the owners, and had never made any contracts or authorized any to be made in his own behalf. His conduct was not at any time such as to bring him within the rule of liability as to administrators who make contracts in their representative capacity unauthorized by the law. He is, therefore, entitled to be dismissed as a party, and to have a decree for his costs.

The merits of the case will now be considered. It is the duty of the owners of a steamer carrying goods and passengers, not only to provide a seaworthy vessel, but they must also provide the vessel with a crew adequate in number and competent for their duty with reference to all the exigencies of the intended route, and with a competent and skillful master, of sound judgment and discretion, and with sufficient knowledge of the route and experience in navigation to be able to perform in a proper manner all the ordinary duties required of him as master of the vessel. In Lord v. Steamship Co., 4 Sawy. 292, 301, Fed. Cas. No. 8,506, Sawyer, circuit judge, with reference to the act of 1851 (Rev. St. §§ 4282, 4285), said:

"It is the duty of the owner to provide the vessel with a competent master and a competent crew, and to see that the ship when she sails is in all respects seaworthy. He is bound to exercise the utmost care in these particulars,— such care as the most prudent and careful men exercise in their own matters under similar circumstances; and if, by reason of any fault or neglect in these particulars, a loss occurs, it is with his privity, within the meaning of the act. But the owner, under this act, is not an insurer. If he exercises due care in the selection of the master and crew, and a loss afterwards occurs from their negligence, without any knowledge or other act or concurrence on his part, he is exonerated by the statute from any liability beyond the value of his interest in the ship and the freight pending."

In The Scotland, 105 U. S. 24, 29, the supreme court, in discussing the limitation act of 1851 (Rev. St. U. S. § 4282 et seq.), after a reference to Norwich Co. v. Wright, 13 Wall. 116, which gave the maritime law of limitation that changed the rigorous rule of the common and civil law, said:

"Our law adopts the maritime rule of graduating the liability by the value of the ship after the injury as she comes back into port and the freight actually earned, and enables the owners to avoid all responsibility by giving up ship and freight, if still in existence, in whatever condition the ship may be,

and without such surrender subjects them only to a responsibility equivalent to the value of the ship and freight as rescued from the disaster."

The various acts of congress are to be construed in pari materia. Section 4283, Rev. St. U. S., provides that the liability of the owner of any vessel for the loss or destruction of any property shipped or put on board of the vessel, "or for any loss, damage, or injury by collision, or for any act, matter or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." Section 18 of the act of 1884 (23 Stat. 57), provides:

"That the individual liability of a ship-owner shall be limited to the proportion of any or all debts and liabilities that his individual share of the vessel bears to the whole; and the aggregate liabilities of all the owners of a vessel on account of the same shall not exceed the value of such vessels and freight pending."

This section is made to apply "to all sea-going vessels and also to all vessels used on lakes, etc." Act 1886 (24 Stat. 81).

Petitioners claim that the act of 1884—which, it will be noticed, does not contain the words, found in section 4283, Rev. St., that the cause of loss shall be "without the privity or knowledge of the owner"—limits the owners' liability to the value of the vessel after she is lost, whether there be privity and knowledge or not. In support of this claim they rely upon the principle announced in Ben. Adm. (3d Ed.) p. 325, § 565, as follows:

"Previous to the act of 1884, it was always proper, if not necessary, to aver in the petition that the liabilities had been incurred 'without the privity or knowledge' of the petitioner. The language of that act would seem, on its face, to have removed that necessity by allowing owners of vessels to limit their liability for acts which had been done with their privity or knowledge, such, for instance, as acts of their own personal negligence, and even their own personal contracts. For the wording of the eighteenth section of that act is that 'the aggregate liabilities of all the owners of a vessel on account of the same shall not exceed the value of such vessel and freight pending.' Whitcomb v. Emerson, 50 Fed. 128. And the holding that the liability of the owner of a vessel for a collision caused by his personal negligence, or his liability on a contract for supplies for the voyage, is included in 'the aggregate of his liabilities on account of the same,' is, to say the least, an obvious construction of that section. But," adds the author, "it has been decided in the lower courts that these words do not include the liability of the owner on his personal contract (The Amos D. Carver, 35 Fed. 665; McPhail v. Williams, 41 Fed. 61; The Giles Loring, 48 Fed. 471), but only his liability on account of the vessel; that is, the liability that is imposed on him by law in consequence of his ownership of the vessel, viz. for the contract or acts of the ship or her master without the owner's express intervention."

In Butler v. Steamship Co., 130 U. S. 527, 553, 9 Sup. Ct. 612, the court, referring to section 18 of the act of 1884, said:

"It seems to have been intended as explanatory of the intent of congress in this class of legislation. * * * The language is somewhat vague, it is true, but it is possible that it was intended to remove all doubts of the application of the limited liability law to all cases of loss and injury caused without the privity or knowledge of the owner."

As it was unnecessary in that case, the court declined to decide the point. Owing to this uncertainty of its true meaning, the court

will, in the course of this opinion, determine whether or not the loss was occasioned by any "privity or knowledge" of the owners, and follow the decisions of the lower courts. The provisions of the act of congress of February 13, 1893, known as the "Harter Act," supersede all the other provisions that are inconsistent with it (Calderon v. Steamship Co., 64 Fed. 876), and will be noticed hereafter.

Was the Emily seaworthy in her hull? She was about six years old. She was built extra strong for wrecking and towing, and carrying lumber and other freight. She had extra pumps. Her timbers were closer together and her machinery larger than many other steamers of her size. About one year previous to her loss she met with a mishap as she was going into Coos Bay. Some of the bolts were out of her keel, and her rudder was gone. She was fixed up at the bay, but when she got outside of the bar she sprung a leak through a missing bolt, and was put into Max Arch, where the captain threw overboard a large quantity of lumber and of iron, and she was towed down to San Francisco and put on the dock. A new keel was put on her, and various other repairs were made. She was then inspected by the inspectors and insurance commissioners, and found to be in good condition. She again went out upon another voyage. Thereafter she had an accident in Oakland creek. Her rudder, stern post, and wheel were broken. These were all newly rebuilt in April, 1893. New pieces of her keel that had been chafed were put in. Laurel wood was used instead of Oregon pine, it being much stronger and better and more expensive. She was then calked. The repairs were made by George Boole, an experienced shipwright, who had been engaged in building ships for over 40 years, about 25 years in California, and himself an owner of 8 or 10 vessels. Capt. Roberts, testified that over $3,000 repairs were made; that half of her keel was put on; that they took the garboard out to see if anything was wrong with her timbers; that her timbers were perfectly sound; that her rudder was above the keel, so that, when she went in over the sand, it would not strike the rudder; that her rudder post was about a foot from the keel, held by two braces on each side, extra strong. She was inspected by D. Marcucci, an assistant to the United States inspector of hulls, and by J. H. Bruce, marine surveyor, who inspected her at the request of the owners. These witnesses all testify that, when the repairs were made, the Emily was in good, seaworthy condition. There is no substantial testimony to the contrary. Capt. Birmingham, the United States supervising inspector of steam vessels, who issued the certificate of inspection, examined her on the 6th of July, 1893. He testified that he made the usual examination; that he tested her boiler, looked into the vessel, at her equipment, about her decks, looked at her topsides, seams, her outfit, and went down into the hold. He said:

"I found her in good condition. She was ready for inspection. If she had not been, of course, we would not have given her her certificate."

Without commenting further on the evidence, I find the fact to be that the owners of the Emily had used due diligence to make her seaworthy when she started on her voyage from San Francisco. on the 7th of July, 1893. She had been thoroughly repaired, and all her machinery was in good working order. It is also shown by satisfactory evidence that she did not become unseaworthy by reason of her towing the Bawnmore to the city. It is true that some witnesses testified that she was strained, and needed repairing, by reason of that work; but there is a decided preponderance of evidence to the effect that she was in good condition when she left San Francisco on her last voyage. Capt. Roberts testified that the Emily hardly pulled on the Bawnmore coming down; that the wind and sea helped drift her down 120 miles; that she pulled her half speed, more times quarter speed; and that she was not injured in any manner by towing the Bawnmore down. Weiding, the second mate, said she was in good condition when she picked up the Bawnmore, and in the same condition when she returned to the city. The Emily leaked a little more than the ordinary wooden vessels, but she never leaked so as to damage her cargo.

The contention of respondents is that, notwithstanding the testimony of all the experts as to the seaworthiness of the vessel when she started upon her voyage, the true test must be sought for in the facts as to the manner of her breaking up, and the condition of her futtock timbers, as disclosed by an examination after her loss, by the discovery of old breaks. There is nothing in the manner of her breaking up that indicated her unseaworthiness, except the shortness of the time in which she went to pieces after striking on the bar, and upon that point there is a wide divergence of opinion among the witnesses which can only be accounted for upon the theory that all persons on board were so excited as not to take any particular notice of the time. All the witnesses agree that the bar at Coos Bay is a dangerous one; that all steamers are liable to strike; that the channel changes frequently, and often suddenly, by the drifting sand; that the Emily, on nearly every trip, touched at the bar, and occasionally struck heavily; that on the trip in question she was drawing about 12 feet of water; that the water on the bar varies from 14 to 26 feet at high tide; and that it was much shallower in 1893 than in the year previous. It was certainly unsafe to go in on an ebb tide.

Capt. Lucas was called as a witness for respondents, and testified as to the disaster as follows:

"We proceeded along slow to the bar, two men at the wheel, a man sounding, two men stationed aft, which was customary. The rest of the crew was around the ship. As we got in very close, and met the heft of the tide, I called out to the engineer to hook her on and let her go. As I rung the jingle and spoke to him I felt the ship drag. At the same time she slewed to the northward. I rung the jingle still again for more speed; told the man at the wheel to put his wheel hard a-port. He said his wheel was hard a-port. The ship kept slewing to the northward. I concluded there was something wrong, and I stopped, and backed her at full speed. As I rung the bell I looked over the stern, or over the side, and I see the rudder going

by. * * * I tried to hold the ship into the channel to see if probably some of the tugs would come down and give me assistance. Nobody came near. * * * Saw that the ship was sinking fast. The engineer said she was making water very freely. I asked him to put on the big pump, but he could not get down into the engine room to make the connection. The ship sunk across the channel, rolled over, and bilged, throwing the freight out of the main hatch." That this occurred "almost as fast as I am speaking it now. * * * I worked her there probably ten or fifteen minutes, backing across from one side of the channel to the other. That is where she done her thumping. I could not tell how far she would go over. I run over from one spit to the other. After that * * * I anchored her."

He also testified that there was no unusual sea at the time. James Magre, captain of tug at Coos Bay for 20 years, said the Emily bilged where she grounded, that the sea got control of her, and that it was bad enough to break her up in a few hours. Weiding, first mate of the Emily, testified that when she struck she was on the outside edge of the bar, just crossing; that he then found 11 feet of water, and the vessel stopped; that in slewing around she got less water, as low as 9 feet; that the tide was running out very strong; that it was about 30 minutes from the time the vessel struck until the rudder was reported lost; that the sea was getting very rough, and struck the ship, knocking everything to pieces that was light work, and washed clean over the houses, 7 or 8 feet from the deck. Hall, the ship joiner, said the Emily was full of water in 10 minutes after she struck; that the sea was not rough until after she sunk; that she did not fill until she had struck very hard, so hard that the stern post and the whole business came up. Wilson testified that the vessel settled down into the water inside of half an hour after she took the bar. Miller, a seaman, testified that the vessel first made a light touch, then a heavy thump, maybe five times, pretty hard before the rudder came up, and that she did not fill up until after her rudder was lost. Widke testified that he saw a part of her keel come up first, and then her rudder. Thompson, a seaman, testified that, about two hours and a half after the steamer first struck, she lost her rudder. Capt. Lucas testified that he examined some of the pieces after the wreck; that the longest piece was 10 or 12 feet, others 2 or 3 feet; that from the appearance of them they had been gone before; that they were all black and split,—"dead black wood, occasioned by salt water"; that the break was in the turn of the bilge at its weakest part. Other witnesses testify to the same fact. But the witnesses all agree that, prior to the wreck, there was never any appearance on the hull to indicate that any of her timbers were broken; that, if her timbers had been broken on the outside, it would have been obvious to them; that, as far as any one could see, the vessel was in good shape; that, if there was broken timber in the inside, it could not have been discovered without ripping off the planking. Capt. Bruce testified that if a vessel like the Emily was cracked, but her timbers sound,—not rotten in any way,—there was no means of ascertaining that fact "except by stripping the whole vessel." Booth, the shipwright, testified that a sea breaking over a vessel when she is fast to the beach does greater damage than if she is afloat. Lucas and other witnesses testified

that, when she became stranded, with the sea breaking over her, she would have gone to pieces if she had been perfectly new, with all her timbers sound, but under such conditions would have lasted longer.

From all the testimony I find as a fact that the real cause of the loss was the mistake or carelessness of Capt. Lucas in attempting to go into Coos Bay on an ebb tide, whereby, owing to shallow water, the steamer became stranded, and that such loss occurred without the fault, knowledge, or privity of the owners of the vessel. The Emily was in a condition to encounter the ordinary perils of her voyage, and this was sufficient to make her seaworthy. The Northern Belle, 9 Wall. 526; The Orient, 16 Fed. 916; The Titania, 19 Fed. 101, 105.

The Edwin I. Morrison, 153 U. S. 199, 215, 14 Sup. Ct. 826, which is relied on by respondents, was in many essential respects different in its facts from the case in hand. Every case must be governed by its own peculiar facts. There it appeared that the bilge pump hole had not been used for four or five years; that the cap and plate had been painted over whenever the water way was painted; that the holes were dangerous unless the caps and plates were kept tight and secure; that tapping with a hammer or unscrewing the cap might have developed any insecurity; and that no such tests were applied. It was with reference to such facts that the supreme court said:

"The obligation rested on the owners to make such inspection as would ascertain that the caps and plates were secure. Their warranty that the vessel was seaworthy in fact 'did not depend on their knowledge or ignorance, their care or negligence.' The burden was upon them to show seaworthiness, and, if they did not do so, they failed to sustain that burden, even though owners are in the habit of not using the precautions which would demonstrate the fact. In relying upon external appearances in place of known tests, respondents took the risk of their inability to satisfactorily prove the safety of the cap and plate if loss occurred through their displacement."

In Quinlan v. Pew, 5 C. C. A. 438, 56 Fed. 111, 115, the court of appeals said:

"From the standpoint of the appellant, the cause of his injury was a structural defect, existing when the vessel sailed from her home port on a new voyage. The alleged defect would have been discovered on an extremely careful scrutiny of the vessel and her top hamper, although quite likely to be overlooked on an ordinary examination. It also appears that all the owners lived in the home port. The propositions of law which the appellant bases on these facts are that, under these circumstances, the risk was on the owners to completely examine the vessel, and put her in order for sea, and that, failing this, they are chargeable with privity or knowledge, not actual, but with that presumed privity or knowledge which for many purposes takes the place of the actual. It will at once be seen that, in the eyes of the law, the conditions may be different from what they are in the cases ordinarily before the courts, wherein the injury comes from something supervening after the voyage has begun, or from something arising from an omission to properly repair or fit a ship between her arrival at and departure from a port where the owner does not reside. At such times it is not expected the owner will be personally present, and the law permits him to act through his agent, who, when the ship is at sea, is the master, or, when in a distant harbor, is either the master or some other suitable person designated to perform the duties ordinarily incumbent on himself in a home port. It has been held that, under some circumstances, the owner may be liable to mariners for faults of the master at sea. * * * Yet, even if he were, such liability would

be limited by the statute, as was settled by the supreme court in the opinions which we will hereafter cite."

Was the master incompetent? Capt. Roberts testified that he was ill when the Emily returned to San Francisco from Caspar creek, and did not go with her on the voyage when she was lost. He said:

"I put Capt. Lucas on, and gave him strict orders not to go in [at Coos Bay] on an ebb tide. I gave him extra orders. The last thing I told him was, * * * 'Now you fetch the ship back.' I told him not to go in on an ebb tide, which he did. * * * Q. Was Capt. Lucas a licensed steamship master? A. Yes, sir. We went to the customhouse and changed the papers before the vessel sailed."

The testimony shows that Capt. Lucas had, prior to the time in question, been master of the steamer Arcata, and had been first mate on the Emily, traveling over the same route on previous trips. He was duly licensed as master by the United States inspector of steam vessels. Under all the facts and circumstances testified to upon the trial, I am of opinion that the evidence is clearly sufficient to show that he was a competent master, and that neither Capt. Roberts nor any of the other owners of the Emily had any knowledge or reason to believe that he was not a competent master, of sufficient capacity and experience to be safely trusted with the duties and responsibilities of the position.

Respondents claim that the remarks of Capt. Roberts at the time he put Capt. Lucas in charge of the Emily indicate clearly that he knew him to be incompetent. This inference is not, in my opinion, warranted by the facts. Capt. Roberts was an owner as well as master of the vessel. It is not to be presumed that he would knowingly place her in charge of an incompetent person. He naturally felt a deep solicitude in the safety of the vessel, and told the master to "fetch the ship back," and not to go into Coos Bay "on an ebb tide." These expressions or words of caution might well have been made to a competent master, and should not be inferred to mean that Capt. Roberts then considered that Capt. Lucas did not have the ability to properly manage the steamer.

Section 4439, Rev. St. U. S., provides that:

"Whenever any person applies to be licensed as master of a steam vessel, the inspector shall make diligent inquiry as to his character, and shall carefully examine the applicant, as well as the proofs which he presents in support of his claim, and if they are satisfied that his capacity, experience, habits of life and character are such as to warrant the belief that he can be safely intrusted with the duties and responsibilities of the station for which he makes application, they shall grant him a license authorizing him to discharge such duties on any such vessel for the term of one year."

The thorough competency, long experience, and unquestioned good reputation of Capt. Birmingham ought to be a sufficient guaranty that this law was strictly complied with before the license was issued to Capt. Lucas.

Section 4401, Rev. St. U. S., provides that every coastwise seagoing steam vessel shall "be under the control and direction of pilots licensed by the inspector of steamboats." Section 4443 provides:

"Where the master or mate is also pilot of the vessel he shall not be required to hold two licenses to perform such duties, but the license issued shall state on its face that he is authorized to act in such double capacity."

Upon these provisions of the statute it is argued by respondents that Capt. Lucas was incompetent, because it was not affirmatively shown that he was a licensed pilot, or that a licensed pilot was in charge of the vessel. The facts are that no evidence whatever was given by either party upon this point. Capt. Lucas was a witness for the respondents. No question was asked as to whether he was a licensed pilot. Upon these facts the court will be justified in presuming that he was a licensed pilot. In Butler v. Steamship Co., 130 U. S. 528, 554, 9 Sup. Ct. 612, the court held that, in the absence of any allegations to the contrary, it will be presumed, in a limited liability case in admiralty, that the captain and the first mate of a seagoing coastwise steamer are licensed pilots. The presumption is that the law in this respect was complied with, and the burden is cast upon the respondents to prove to the contrary; and, not having offered any evidence upon the subject, they cannot claim that Capt. Lucas was not a licensed pilot.

Was the Emily unseaworthy in her crew? Capt. Roberts testified that she had a full crew, the same she had been carrying all the time. "Q. How many men is that? A. Six men, to my knowledge. If there was anybody left after the captain had charge of her, I don't know. He did not report it to me. * * * When I left the ship there were three officers. One was made master, the other one mate, and the other one second mate. Q. What is the usual crew of a vessel of that kind? A. She carries two mates and a master, and six sailors, and a cook, and steward, and boy, a couple of waiters sometimes, two firemen, and two engineers," and on this trip had one ship joiner.

No provisions of the statute have been cited which declare the number of men the steamer should carry. Section 4463, Rev. St., provides:

"No steamer carrying passengers shall depart from any port unless she shall have in her service a full complement of licensed officers and full crew, sufficient at all times to manage the vessel, including the proper number of watchmen."

There is no evidence tending to show that the Emily did not have a complement of officers and crew "sufficient at all times to manage the vessel." This is the essential object required by the law. The inspector's certificate, however, states that the complement of the crew shall be the master (and pilot), 2 mates, 2 engineers, and 12 crew. This makes 17 in all. The contention of defendants is that "12 crew," in the inspector's certificate, means 12 sailors, who, with the officers, navigate the vessel, man the lifeboats, and whose presence renders the vessel seaworthy. It will be noticed that the inspector's certificate does not mention firemen. Yet it is self-evident that two firemen were needed in order to properly manage the vessel, and must necessarily be included in the term "crew." From all the evidence in the case I am of opinion that the Emily had her full complement of men; that the word "crew," as used in the certificate, should not be construed to mean sailors only; and that she was not unseaworthy in her crew.

Was the deviation unlawful or improper? It is argued by re-

spondents that the deviation of the Emily in taking the Bawnmore from Caspar creek to San Francisco was not authorized by the provisions of the act of February 13, 1893, known as the "Harter Act." Section 3 of this act reads as follows:

"That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped and supplied, neither the vessel, her owner or owners, agents, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agents, or master be held liable for losses arising from dangers of the sea or other navigable waters, * * * or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

At the time the Emily first sighted the Bawnmore, she was on the rocks watched by the steamers Pomona and Weeott. The Pomona went on her way with her passengers. The Weeott remained and helped the Emily tow the Bawnmore a distance of about 30 miles, to Caspar creek, where she was anchored and pumped out dry. Respondents claim that the Bawnmore was then safe; that she had a sufficient crew for her protection, with ready means of communication with San Francisco by telegraph; that, in addition thereto, two efficient tugs, the Fearless and Rescue, were at hand ready to tow, and soliciting the towage of, the Bawnmore to the city. There is a diversity of opinion among the witnesses as to whether Caspar creek was a safe place for the Bawnmore. Capt. Roberts, after minutely describing the condition of the vessel, the nearness of the rocks, and stating that there were no means of repairing the vessel unless she was put on the beach, testified that Caspar creek was a rough place; that it is only safe for ships for a few months in the year; that if it blows southeast, southwest, or westerly, it is rough, and throws in a nasty sea with a ship like the Bawnmore; that Caspar creek was not a safe place for a vessel in her condition or size to be in; that her rudder and her propeller were broken; that she could neither navigate nor steer; that San Francisco, distant 125 miles, was the nearest safe place where she could be repaired. Lucas testified that Caspar creek was a dangerous place for a vessel like the Bawnmore, particularly when crippled. Capt. Yarneburg, of the Weeott, testified that in summer time Caspar creek is a good harbor; that you cannot depend on the weather; that it is all owing to the condition of the weather whether the harbor is safe or unsafe; that no one can tell how long the wind will blow from the same quarter; that if any bad swells came in they would have thrown the Bawnmore on the sand spit or beach; that no bad swells came in while they remained at Caspar creek. Capt. Scott, a pilot in command of the tugboat Fearless, testified, on behalf of the respondents, that the Bawnmore, when he first saw her at Caspar creek, was safe as far as anchorage was concerned, but she was full of water; that with his tug and the Rescue they could have pumped her out in 12 hours; that the Fearless had 10 times the pumping capacity of the Emily, and 10 times the towing capacity and horse power. Upon his cross-examination he testified as follows:

"Q. Would you consider it a safe thing to leave a ship there which you had undertaken to salve,—you had towed her for some distance out at sea, * * * and taken her in to pump her out; she was unable to steer herself, unable to propel herself in any way, and was as large a steamer as the Bawnmore; assume that you have got her in there, and you have drawn her anchor up some distance,—would you consider it a safe thing, even in July, to turn, and come down to San Francisco, and leave that vessel behind? A. Yes, sir; I should consider it perfectly safe to lay" with a crew.

The Emily had the right, under the statute, to pick up the Bawnmore and tow her to the nearest safe place. She was unquestionably justified in so far deviating from her course as to tow the Bawnmore into Caspar creek. In thus deviating she would be engaged in "attempting to save life and property at sea." She also had the right to remain with the Bawnmore until that vessel was perfectly safe. After a careful consideration of all the testimony I am of opinion that the Bawnmore was not in such a safe place at Caspar creek as required the Emily to pursue her journey to Coos Bay and to leave the Bawnmore alone, after she was anchored and pumped out dry at Caspar creek, but she was made safe by the presence of the tugs Fearless and Rescue. The captain of the Emily was not justified by the law, under all the facts and circumstances of the case, in further deviating from his course by towing the Bawnmore from Caspar creek to San Francisco. It was the intention of the act of 1893 to encourage the saving of life and property at sea, and to relieve the shipowners from any loss or damage that may occur from any deviation in rendering such service. But it does not necessarily follow that the ship performing such service is justified in further deviating from its course after the lives and property have been saved at sea. Every vessel transporting merchandise and passengers to or from different ports—her owners having exercised due diligence to make her in all respects seaworthy and properly manned, equipped, and supplied—has the right to deviate in its course so far as may be necessary to save life and property, but as soon as this duty is performed her right of deviation ceases, and it becomes her duty to then pursue her regular voyage, and fulfill her contracts by carrying her cargo and passengers to their port of destination. The question as to her right of salvage is not involved. The act of 1893 was not passed for the purpose of enabling vessels, saving life and property at sea, to earn salvage. That right is only incidental to such service. The object of the statute, as before stated, was to encourage the saving of life and property, and relieving the vessel performing such service from liability in case of loss. In taking the Bawnmore into Caspar creek the Emily was doing an act which the law seeks to encourage, and for that act she was, of course, entitled to salvage; but when the Bawnmore was made safe from any cause, the Emily had no right to tow her any further for the sole purpose of earning a greater amount of salvage.

Did the owners, other than Capt. Roberts, have knowledge and privity of the deviation of the Emily from Caspar creek to San Francisco? The testimony shows that Meyer, the managing owner of the Emily, destroyed all the papers and telegrams relating thereto about a year after the loss of the vessel. The reason given for

the destruction was that he thought he had no further use for them; that the round trip to Coos Bay and back occupied only 8 or 10 days, and there was no occasion for any correspondence with Capt. Roberts, because the vessel usually got around quicker than the mail; and that only occasional telegrams were received about freight. He testified that he received a communication from Capt. Roberts to the effect that he had towed the Bawnmore into Caspar creek and was pumping her out; that the communication of Capt. Roberts regarding the pursuit of his voyage was, "I told him it would be better to make some arrangements and send the Emily on to Coos Bay on her route from Caspar creek, instead of coming down here"; that he afterwards learned from the newspapers that the captain was bringing the Bawnmore to San Francisco. The other owners testified that the only knowledge they had about the Bawnmore was what they received from the newspapers to the effect that Capt. Roberts was towing her into Caspar creek. Plate, the purser of the Emily, testified that he saw a telegram from Meyer & Akman to Capt. Roberts to the effect that "the steamer Emily had better go on her regular course; will send tug to tow Bawnmore." Capt. Scott testified:

"I saw one telegram received by Capt. Roberts from Meyer & Akman. The contents was to instruct Capt. Roberts not to allow the Fearless to assist him with the Bawnmore under any consideration."

The testimony of the witnesses is, in many respects, unsatisfactory. The communications and telegrams have been destroyed. The memories of the witnesses as to the contents thereof are not clear. After weighing all the evidence, I find the preponderance thereof to be, in favor of the petitioners, that the owners, with the exception of Roberts, had no privity or knowledge, concerning the towing of the Bawnmore to San Francisco. The testimony of Scott, at first blush, would seem to be to the contrary. But if it be true, as testified to by Plate, that Meyer notified Roberts that they would send up a tugboat for the Bawnmore, this would account for the dispatch, referred to by Scott, not to allow the Fearless to assist. But in any event the other owners, besides Roberts, testified that they had no knowledge or privity of this deviation.

With reference to the death of the passenger, C. Robinson, the testimony clearly shows that it was occasioned by his own negligent and improper conduct, and was not in any manner to be attributed to the alleged unseaworthiness of the Emily, or incompetence or carelessness of the master, or of the deviation, or of any wrong or negligence of the owners of the vessel. He would have been saved, the same as the other passengers, except for his personal desire to take his baggage with him against the positive order of the captain of the lifeboat, and the manner in which he attempted on the third trip to get into the boat contrary to the orders and caution given him. Capt. Lucas was called upon to detail the circumstances of Robinson's death, and testified as follows:

"As soon as the lifeboat came alongside I asked the lady passengers all to get ready, and passed them into the boat, and afterwards the captain of the boat said that he could hold a few more, so I called for the husband and the

elderly gentleman. Mrs. Robinson went in the first boat, and her child. The captain of the life-saving station boat said he had enough, and he pulled away. Mr. Robinson was standing * * * on the upper deck, close by, with a shawl in a strap in his hand. I called him down to go into the next boat. The captain of the lifeboat refused to take any baggage. In the meantime, while he was arguing about it, the boat was filled with passengers and shoved off. * * * I turned around to go on the deck, The chief engineer sang out, 'Man overboard.' * * * I jumped on the rail. Saw Mr. Robinson floating by. I called to the men to throw a rope, but all our small lines were washed overboard at the time, and we had nothing but large ropes. He drifted past the stern about 30 feet. The lines would not reach him. I signaled for the captain of the lifeboat to come back and pick up Mr. Robinson, but he said he could not jeopardize the lives of the other passengers for one man. * * * We watched him for 20 minutes, and saw him floating. He had a life preserver on. Afterwards some of the wreckage struck him. I believe that is the way he lost his life. * * * Q. Did he, or not, have an opportunity to go on board the boat? A. He did. Q. Did he accept or refuse it? A. He would not go in the boat because he had to give up his package. He would not give up that, and he lost his chance twice through it. Q. I believe you made a report of those facts to the United States inspector? A. I did."

This witness did not see Robinson at the time he fell into the water. Several of the witnesses testified that, as the lifeboat started, Robinson grabbed hold of a rope or line and slid down, and lost his footing, and fell into the water, and was drowned. Rosenblatt testified as follows:

"I see Robinson get off the boat and make an attempt to get in the lifeboat. I see him get hold, and put one foot in. Just as he put his foot in they started off. It seemed to me, from the motion of the lifeboat, on account of a little swell, that it gave a sort of a lurch, and he went over. They kept on rowing, and I saw him in the water. I saw him fall overboard."

Plate testified:

"When the second boat came back, Mr. Robinson still held his bundles in his hand, insisting that they should accompany him in case he got in the boat. The life-saving captain insisted he could not allow any bundles or baggage to incumber or be in the way of the passengers. So the captain pulled off again with his second boat load. Between the time of the second and third boat, Mr. Robinson, a man by the name of Mr. Flanagan, and a third party * * * were standing in the after part of the ship preparing to jump in our lifeboat, which was lowered at the time by the order of the captain. Our boat that was hanging on the davits. That boat was lowered halfway. The captain gave orders to those three gentlemen to jump in. They jumped in. In the meantime she was lowered halfway, and the seas were breaking very high, and breaking our houses up. When the boat had been half lowered, the seas were breaking so high and so hard that the captain had given the order to raise her, and given the men as well, who were in her, orders to jump out. Mr. Flanagan and this other gentleman had jumped out of the boat, and Mr. Robinson, who lingered with his bundles, slipped between this boat and the side of the ship, and caught hold of a line, which apparently was fast, but I do not think it was, because he drifted right out with the tide of the sea. * * * He would not jump on board when he had a chance, unless he could take his bundles with him, and insisted on holding those two bundles. The request of the life-saving captain was to leave his bundles alone, and not take them along; that he was saving life, and not saving baggage or freight."

The facts of this case do not bring the death of Robinson within the provisions of section 4493, Rev. St. U. S., nor within the principles announced by the supreme court in The Max Morris, 137 U. S. 1, 8, 11 Sup. Ct. 29, where it was held that, there being negligence

established against the officers of the vessel, the libelant was not debarred from the recovery of any sum of money by reason of the fact that his own negligence contributed to the accident.

It still remains for the court to determine, from the facts, the extent to which the owners of the Emily are entitled to have their liability limited as to the damage sustained by the loss of goods and merchandise on account of the unlawful deviation of the schooner and of her loss by the carelessness of Capt. Lucas. It follows, from the views already expressed, that under the act of 1884 Capt. Roberts is liable in the proportion which his individual share of the vessel, at the time of the affreightment, bears to the whole value of the goods lost. As to the other owners, I am of opinion that, when all the testimony and all the various acts of congress are considered, they are entitled to avail themselves of the provisions of section 4283 et seq., Rev. St. U. S. This, it seems to me, is the result of the reasoning of the court in Butler v. Steamship Co., 130 U. S. 527, 549, 9 Sup. Ct. 612, where, in holding that section 4283 applies to cases of personal injury and death, as well as to cases of loss or injury to property, the court said:

"The ground of the loss of the limited responsibility of shipowners * * * is that, for the encouragement of ship building and the employment of ships in commerce, the owners shall not be liable beyond their interest in the ship and freight for the acts of the master or crew done without their privity or knowledge. It extends to liability for every kind of loss, damage, and injury. This is the language of the maritime law, and it is the language of our statute, which virtually adopts that law."

See, also, Craig v. Insurance Co., 141 U. S. 638, 645, 12 Sup. Ct. 97; In re Leonard, 14 Fed. 53.

The interests of the owners, other than Roberts, to be surrendered, is the value of the vessel at the end of the voyage, which in this case would be at the time of the wreck after the disaster. Whenever the owner shall take his proceedings to limit his liability, he must take it as of the time of the end of the voyage out of which the liabilities against which he seeks to limit his liability arose. That is the time as to which the value of the vessel and freight pending is to be fixed, and that is the time when the liabilities to be limited must be ascertained. The City of Norwich, 118 U. S. 468, 490, 6 Sup. Ct. 1150; The Great Western, 118 U. S. 520, 6 Sup. Ct. 1172; The Dorris Eckhoff, 30 Fed. 140; The Giles Loring, 48 Fed. 468.

The words "freight pending" represent the earnings of the voyage, whether from the carriage of passengers or merchandise. The Main v. Williams, 152 U. S. 122, 131, 14 Sup. Ct. 486. But they do not include salvage, for that is paid as a reward to the vessel, its officers, and crew in their efforts to save life and property, and is personal to the salvors, irrespective of any relation they bear to others. Ben. Adm. pp. 169, 170, § 300.

Let findings of fact be drawn in accordance with this opinion, and such further testimony be taken as will enable the court to render a final decree in conformity with the views herein expressed.